### G. B. ZIGLER CO. v. BARKER BARGE LINE.
### THE LETA.

### THE WHITECASTLE.
### THE BBL–106.
### No. 12204.

Circuit Court of Appeals, Fifth Circuit.
April 23, 1948.

T. G. Schirmeyer, of Houston, Tex., and John R. Stewart, of Lake Charles, La., for appellant.

Benjamin W. Yancey, Jos. M. Rault, both of New Orleans, La., and R. A. Anderson, of Lake Charles, La., for appellee.

Before SIBLEY, McCORD, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

Appellant, owner and operator of the tug Leta, and her tow of four barges, libelled the tug Whitecastle, which was pushing two other barges, for damage done by a head-on collision at night of the barges in a part of the Intracoastal Canal near its locks into the Mississippi River at New Orleans, charging fault against the Whitecastle in navigating on the wrong side of the channel, in not having proper lights on the tow, in failing to stop when danger became apparent, in misusing a blinding spotlight, and in failing to keep a proper lookout. Appellee claimed the Whitecastle and defended the libel, and cross libelled the tug Leta and her barges, charging the Leta with the very same faults. On the trial many facts appeared without dispute, and as to others there was conflict between the testimony of the members of the two crews. The court found most of the contested facts against the Leta, dismissed the libel against the Whitecastle and adjudged that full damages be recovered against the Leta.

We recognize the rule that when the witnesses testify orally the opinion of the trial judge, who heard and saw them testify, as to their accuracy and credibility, will not usually be overridden by the appellate court, but we must hold that on the facts found by the judge, and those clearly appearing from the evidence, there was fault on both sides contributing to the collision which requires that the damages be divided. The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148.

As found by the judge, the collision occurred in a straight part of the canal at 8:30 P. M. March 3, 1945, the Whitecastle coming north and pushing two barges tandem, each 200 feet long and 40 feet wide, fully loaded and low in the water. The Leta was going south with two tandem barges each 210 feet long and 40 feet wide, to the starboard side of which were lashed two smaller barges each 135 feet long and 32 feet wide, the barges being all empty and drawing only about 18 inches of water and riding some nine feet above the water. The Leta was behind the smaller barges and on the starboard side of the rear one of the longer barges. Each tug was using a search light which was seen by the other. When the tows were about a half mile apart one-blast whistles were exchanged for a port-to-port passage and the Whitecastle pulled over to her starboard and continued about 40 feet from the bank. The Leta (as the judge concluded) failed to alter her course and the port corner of her forward barge collided with the similar corner of the Whitecastle's forward barge, rode up on the latter for some 30 feet, damaging both barges. There were proper lights on each tug, but neither had proper lights on the forward ends of the tows. The judge found that the Whitecastle had no lookout at the head of her tow, but a deckhand in the pilot house who was a sufficient lookout, but if not, the failure did not contribute to the collision; and that the Leta had no one charged with the duty of acting as lookout, but, a person posted at the head of the tow was directing his attention not to the Whitecastle but to the boats and barges on the Leta's right bank. The speed of the Whitecastle according to all the witnesses was more than twice that of the Leta, but was held to be not inappropriate. The captain of each tug, each being the helmsman, testified to being unable to see the barge lights of the other, or the barges themselves, till the very moment of collision. The Whitecastle's crew testified that the Leta's spotlight was blinding them all during the approach, and that flashing their own spotlight as a signal did not correct this. The Leta's witnesses said her spotlight was used to illumine her right bank so as to keep a proper distance from it. The judge adopted the Whitecastle's version of this. Each crew testified to keeping from 25 to 40 feet from their starboard bank and so, adding the width of their respective tows, well within the width of 150 feet of their side of the channel, the total width being 300 feet.

We see no reason to doubt that each helmsman thought he was keeping at a

proper distance from his starboard bank to insure a safe passage, but since it is undisputed that in the collision the two barges overlapped each other by eight or ten feet, one or both steersmen failed so to do. Each failed to see the barges of the other till too late. Each steersman was 400 feet or more from the barge he was colliding with. The necessity of a lookout at the front of each tow is apparent, and had there been effective lookouts and good barge lights at the front a collision could probably have been avoided by stopping, or by altering the course of either tow by just a few feet.

The finding is not supported by the evidence that the Whitecastle had a deckhand as a sufficient lookout in the pilot house. His testimony was: "I was doing watch." "Q. What kind of watch were you standing? A. Deck hand. Q. What are the duties of a deckhand? A. I don't know. I was standing there on that watch. * * * I was to look all over the deck and see that all of the equipment is placed properly." These are not the duties of a lookout, nor is a pilot house over four hundred feet from the head of the craft the place for one to be. "Proper lookouts are competent persons, other than the master and helmsman, properly stationed for that purpose on the forward part of the vessel; and the pilot house in the night time, especially if it is very dark and the view is obstructed is not the proper place." The Ottawa, 3 Wall. 268, 273, 18 L.Ed. 165. "A competent and vigilant lookout stationed at the forward part of the vessel and in a position best adapted to descry vessels approaching at the earliest moment is indispensable to exempt the steamboat from blame in case of accident in the night time while navigating waters in which it is accustomed to meet other watercraft." St. John v. Paine, 10 How. 557, 585, 13 L.Ed. 537.

Nor is the finding sustained by the evidence that the Leta had no one charged with the duty of acting as a lookout. No one so testifies, but both her captain and one Duhon testify that the latter was stationed as lookout at the head of the tow on the starboard smaller barge, and Duhon testifies that he was watching principally for boats that might be moored on the starboard bank, but saw the Whitecastle's barge approaching fast without lights, and ran over and gave his captain a flash light signal to run back, but too late. The two smaller barges were torn loose from the larger ones which collided, and they fetched up on the starboard bank, as all agree, Duhon being found on them. The superior speed and weight of the Whitecastle's tow pushed the Leta's large barges back up the canal some 400 feet so that the Whitecastle stopped opposite the smaller barges. While Duhon was thus a lookout in a proper post it is true that he was not attending much to the approach of the Whitecastle, whose spotlight alone he could see, to observe whether she was pushing a tow, and was at fault in that respect.

The judge in his opinion concluded that neither tug had a sufficient lookout; that neither stopped nor tried to; that neither gave a danger signal; and that neither had proper lights at the head of the tow. But he thought the Leta's barge protruded across the center line and that made her solely at fault. We cannot agree. The "narrow channel rule", 33 U.S.C.A. § 210, is not absolute, but reads: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." On this agreed port-to-port passage each tug was under duty so to keep it tow; but the other was not absolved from the usual precautions and watchfulness against failures and accidents. Another rule, 33 U.S.C.A. § 221, is that "Nothing in these rules shall exonerate any vessel, or owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." It cannot be said that the failure of either tug to have properly posted lookouts and proper lights on the barges had no part in causing the collision. A lookout at the front of the

Whitecastle's tow could not only have had a better opportunity to see generally what was approaching but probably would not have been so much affected by the Leta's searchlight which is claimed to have been focused on the Whitecastle's pilot house four hundred feet back, for the Leta's barges rising more than a man's height above the Whitecastle's would have cut the light out of his eyes as they drew near. The barge lights which the Pilots Rules require would have helped proper lookouts. The failure to have both proper lights and lookouts is statutory fault in both tugs which may have contributed and probably did contribute to the collision and requires a sharing of the damages.[1] A decree will be entered accordingly, with costs of appeal against the appellee, and with further proceedings in the district court to fix the amount of the damages.

Reversed and remanded.

---

[1] The right of the Whitecastle to proceed on its starboard side of the channel without interference by the Leta resembles the privilege and duty of the vessel to starboard to hold her course and the duty of the other vessel to keep out of her way, when the two are on crossing courses in open waters. But such privileged vessel is still under the usual duties of caution, and is often held to share the damages caused by collision for contributing fault. Sawyer v. McDonald, 5 Cir., 165 F.2d 426; The Manitoba, 122 U.S. 97, 7 S.Ct. 1158, 30 L.Ed. 1095; The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126; The West Hartland, 9 Cir., 2 F.2d 834. See also Chamberlain v. Ward, 21 How. 548, at page 567, 16 L. Ed. 211.