E. A. ANTHONY, Administrator of the Estate of Madelene Nelson, deceased; E. A. Anthony, Administrator of the Estate of Robert Elliott, deceased; E. A. Anthony, Administrator of the Estate of Connie Nelson, deceased; and E. A. Anthony, Administrator of the Estate of John Collins, deceased, Appellant,

v.

**INTERNATIONAL PAPER COMPANY,**
a corporation, Appellee.

No. 8213.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 13, 1961.

Decided April 18, 1961.

John L. Nettles, Florence, S. C. (James P. Mozingo, III, Darlington, S. C., and Arthur W. Holler, Jr., Myrtle Beach, S. C., on brief), for appellant.

Harold A. Mouzon, Charleston, S. C. (B. Allston Moore and Moore & Mouzon, Charleston, S. C., on brief), for appellee.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This is an appeal taken from judgments in favor of International Paper Company, the defendant, in four consolidated suits brought by the administrator of the estate of each of four colored persons who were drowned in the Waccamaw River in South Carolina when a small motorboat in which they were embarked was capsized by the swell from the tug boat Southern Craft No. 7, owned and operated by the defendant.

The deceased were Robert Elliott, 17 years of age, the operator of the motorboat, and three passengers, to wit: Madelene Nelson and Connie Nelson, 9 and 10 years of age, respectively, and John Collins, an adult, 37 years of age. The suits are based on the wrongful death statute of South Carolina, Title 10, Chapter 23, Article 2, Sec. 10–1951 of the

South Carolina Code. Jurisdiction is based on diversity of citizenship, since in each case the plaintiff administrator is a citizen of South Carolina and the defendant is a corporation of the State of New York. The cases were submitted to a jury, who found a verdict in each case for the owner of the tug. Reversal of the judgments is sought primarily on the ground of alleged errors in the charge of the District Judge.

The accident happened between 5:30 and 5:45 P.M. on December 22, 1955, on the west side of the Waccamaw River near the shore of Sandy Island. The river is within the territorial limits of South Carolina and is part of the Inland or Intracoastal Waterways. Sandy Island has about 300 inhabitants, many of whom cross the river in small boats, morning and evening, to and from their places of employment on the east side of the river. The captain of the tug was aware of this fact. About 5:10 P.M. the motorboat in charge of Elliott, an experienced operator of such craft, left a landing on Brookgreen Creek, one and a half miles east of the river, for a twenty minute trip to a landing on Sandy Island on the west side of the river. The motorboat was 13½ to 14 feet in length, 36 to 42 inches in width, and 13 to 18 inches in height. It was propelled by a 7-HP outboard motor. It proceeded on this occasion a distance of one and half miles westerly on Brookgreen Creek to its junction with the river and then crossed the river to the western side and proceeded southerly toward the Sandy Island landing, one and a quarter miles distant on the western bank. The boat carried no lights.

At the same time, the tugboat was proceeding northwardly on the river from the town of Georgetown, some twenty-five miles to the south, where it had been sent for repairs. The vessel is a blunt-nosed push type tug, 70 feet in length, with a 20 foot beam, and is propelled by two caterpillar engines which produce an aggregate of 430-HP. Its superstructure covers two-thirds of the length of the vessel and consists of an enclosed house on the deck, on top of which are state-rooms and an enclosed pilothouse near the bow furnished with windows at the front, sides and back. The crew normally consists of seven men but on this occasion five men were aboard—the captain, a mate, an assistant engineer, and two deck hands. One or two other men who had accompanied the vessel when it went south from Wilmington to Georgetown were returning to Wilmington by automobile.

The vessel had left Georgetown about 4:00 P.M. and a short time before the accident had reached a point in the river designated as Marker 67, about three quarters of a mile south of the scene of the accident. Shortly before it had passed Marker 73, some two miles to the south of Marker 67 at a short bend in the river, but had not sounded its whistle in accordance with Rule 5, article 18 of the Rules of Navigation for Inland Waters, 33 U.S.C.A. § 203. The captain of the tug admitted that the whistle should have been sounded at this point.

There is conflict in the evidence as to the speed at which the tug was traveling at the time. It had a maximum speed of approximately ten miles per hour and according to its master it was proceeding at the time, without a tow, at about seven miles per hour. On the other hand, witnesses for the plaintiff, who arrived at the scene of the accident shortly after it occurred, testified that the captain told them that he was running full speed ahead when he first saw the motorboat, since he was trying to reach Wilmington to tie up for the holidays.

On the day of the accident the sun set at 5:17 P.M. The captain of the tug testified that at the time of the accident it was between sunset and dark and that there was fair visibility straight ahead. Witnesses for the plaintiff, who were on the river in this area about the time of the accident, testified that the landing on Sandy Island could be seen from the mouth of Brookgreen Creek, one and a quarter miles away.

The water was calm as the vessels approached one another. The captain was

in the pilothouse and was the only person engaged in the operation of the vessel. The rest of the crew were at supper inside the main house on the deck. Three or four minutes after passing Marker 67 the captain first heard the engine of the motorboat and then saw it a little bit ahead of him at a distance of about 250 feet off his port bow and about 100 feet from the western shore. It seemed to him that the boat was overloaded and was traveling too fast, and he was alarmed when it headed towards the western shore and exposed its side to the waves from the wake of the tug. Looking back through the rear window of the pilothouse, which was larger than the front window and gave a better view, the captain saw that the motorboat had capsized and its occupants thrown into the water. He reversed his engines, swung the tug around and headed for the boat, and got within 15 feet of the occupants in the water and threw them life preservers, but they made no attempt to take hold of them. A skiff was lowered from the tug—but the occupants of the boat went down before they were reached. The members of the crew of the tug testified that they gave no thought to jumping into the water to save the drowning persons.

The principal contention of the plaintiff is that the judge erred in failing to give an instruction to the jury in the following terms: "The master of a vessel cannot, as a matter of law, act both as helmsman and lookout and if you find that the failure of the SK-7 to have a lookout was a proximate cause of the sinking of the small boat, it would be your duty to find for the plaintiff." Originally an instruction to this effect was incorporated in a copy of the charge which the judge gave to the attorney for the plaintiff the day before the argument took place. On the next morning, however, before the argument, the judge informed the plaintiff's attorney that he would not give the instruction in this form. The charge to the jury after the argument included the following passages as to the necessity of a lookout.

It set out Rule 29 of the Inland Rules of Navigation, 33 U.S.C.A. § 221 as follows:

"Article 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

In addition, the judge gave the following instruction as to a lookout:

"Now something has been said about a proper lookout. Of course, as one of the rules states, a proper lookout must always be maintained by all water boats.

"If you find that the SK-7 was operating in a river frequented by vessels and where small craft would naturally be afloat without a proper lookout, then defendant would be liable, provided a lack of proper lookout is the proximate cause of the accident."

A misunderstanding arose between the judge and the attorney for the plaintiff as to the instruction which the judge intended to give to the jury on the matter of lookout. The plaintiff's attorney states that the judge informed him before the argument that he would not give the instruction first set out above *"as a matter of law"* but did not inform him that the instruction would be omitted altogether. Accordingly, in his address to the jury, he stressed the fact that the master of the tug was acting illegally when he served both as helmsman and lookout of the vessel, and consequently was put in a bad light when the judge omitted any reference in his charge to the fact that the master acted in both capacities. On the other hand, the judge, in an opinion refusing plaintiff's motion for new trial, stated that he could not accurately remember just what occurred in chambers on the morning of the argument but seemed to recall that he then

informed plaintiff's attorney that he would not charge that a helmsman cannot act as a lookout. The judge added that even if his recollection was incorrect the error was harmless, since the charge as originally drawn was not a correct statement of the law. During the course of the charge the judge expressly directed the attention of the jury to the rule that the plaintiff could not recover unless he showed by a preponderance or the greater weight of the evidence that the defendant not only failed to act with ordinary care but also that this negligence was the direct proximate cause of the injuries. It appears, however, that the plaintiff's attorney was permitted to argue the question in the manner above described.[1]

■ Basic to the consideration of the correctness of the charge is the question whether the case is ruled by the principles of maritime law. The occupants of the motorboat were drowned in the navigable waters of the State of South Carolina and recovery depends upon the applicability of the wrongful death statute of that state. The Death on the High Seas Act of Congress, 46 U.S.C.A. § 761, applies only to death occurring on the high seas and recovery in this case must be based upon the South Carolina statute in accordance with the principles laid down in recent decisions of the Supreme Court. See Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524; United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541; Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305; Goett v. Union Carbide Corp., 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341. In the Tungus case the Supreme Court, four justices dissenting in part, held that when admiralty adopts a state's right of action it must enforce the right with whatever conditions the

state has attached; and hence the federal courts cannot apply the admiralty rules to a case based on the wrongful death statute of a state unless to do so would accord with the terms of the statute as interpreted by the courts of the state. In Tungus, where the death occurred in the territorial waters of New Jersey, the courts of that state had not spoken upon the question whether in such a case the maritime or common law should apply. Nevertheless the Court of Appeals for the Third Circuit reached the conclusion (252 F.2d 14), after careful consideration, that a claim for unseaworthiness as developed by federal maritime law was encompassed by the New Jersey Wrongful Death Act, N.J.S.A. 2A:31–1 et seq. as a matter of state law. The Supreme Court found itself unable to say that this conclusion was clearly wrong and therefore affirmed.

The minority of the Supreme Court in Tungus thought that in a wrongful death case on navigable waters of a state the wrong is defined by the general maritime law and that the state statute is availed of merely to furnish the remedy and that therefore, in any case of wrongful death on such waters, the principles of the maritime law should be applied.

As will appear from our opinion in Union Carbide Corp. v. Goett, 4 Cir., 278 F.2d 319, some doubt exists as to whether the view expressed by the majority or that expressed by the minority in Tungus represents the final position of the Supreme Court on this matter. In our judgment this uncertainty does not affect the decision to be taken in the pending case. It has been noted that the Third Circuit held in the Tungus case that the wrongful death statute of New Jersey should be interpreted, in the absence of any state decisions to the contrary, as providing for the application of the prin-

---

1. With respect to other violations of the Inland Rules by the two vessels, the judge called the attention of the jury to the failure of the tug to sound its whistle when approaching Marker 73 south of the scene of the accident and the failure of the motorboat to carry lights; and he correctly instructed the jury that if either party was in violation of any of the Inland Rules that party had the burden of proving that the violation not only did not contribute to the injury but that it could not have contributed to the injury.

ciples of maritime law in case of death upon the territorial waters of the state. We reached the same conclusion not only in our opinion in Union Carbide Corp. v. Goett, supra, in respect to the law of West Virginia, but also in the case of Holley v. The Manfred Stansfield, 4 Cir., 269 F.2d 317, with regard to the wrongful death statute of the State of Virginia, Code 1950, § 8–633. We think, in the absence of any contrary indication by the courts of South Carolina, that the same ruling should be applied to the wrongful death statute of that state, for it is obviously desirable that the same principles be applied to wrongful death on navigable waters whether it occurs on the waters of a state or on the high seas, and also that the same standards be applied to govern conduct on the navigable waters of a state whether departure from those standards results in injury or in death. We have found nothing in the decisions of the courts of South Carolina to the contrary, and indeed it has been assumed by the District Court and by counsel for both sides that the principles of the maritime law should be applied in the pending case.

■ We revert to the contention of the plaintiff that the District Judge erroneously charged the jury as to the duty of the tug to have a lookout in addition to the master who was in charge of the operation of the tug. The necessity for a proper and efficient lookout at this point in the river was shown by the testimony in respect to the operation of small boats for the transportation of residents from shore to shore. The navigation of such craft is necessarily affected by the wake or swell caused by the passage of larger vessels and the cases hold that a duty is imposed upon them to exercise due care for the safety of the smaller boats traversing the inland waters. Thus in West India Fruit & SS Co. v. Raymond, 5 Cir., 190 F.2d 673, a steamship which passed the inlet dock at Palm Beach at a speed of ten or twelve knots per hour was held liable for injuries caused to a fishing boat moored to the dock when it was thrown violently

against the pilings by the swells from the moving ship; and in United States v. Ladd, 4 Cir., 193 F.2d 929, the United States was held liable for the damages caused by a Coast Guard cutter when it passed at full speed a sloop becalmed in the Norfolk harbor so that the mast of the sloop was snapped in two as a result of the impact of the swells from the cutter. See also Williamson v. The Carolina, D.C.E.D.N.C., 158 F.Supp. 417.

■ A similar situation was met in the instant case, and there was sufficient evidence to require the submission to the jury of the adequacy of the lookout on the tug. There was, in the first place, the testimony of the master of the tug that there was fair visibility straight ahead of his vessel and yet he did not see the motorboat until it was almost abreast the bow of the tug on the port side. He stressed the failing light between sunset and dark prevailing at the time and the difficulty of seeing the unlighted boat against the background of the river bank; but testimony given on behalf of the plaintiff showed that it was still possible to see an unlighted object on Sandy Island one and a half miles away. Moreover, there was evidence that the captain was running the tug at full speed in order to reach Wilmington for the approaching Christmas holidays, and yet the only lookout was the captain himself, who was inside the pilothouse and had other duties to perform. Under these circumstances the District Judge correctly submitted to the jury the question whether the tug was keeping a proper lookout at the time of the accident.

■ There still remain, however, the specific questions as to whether the plaintiff was prejudiced by the change in the instructions to the jury, above described, and also by the failure of the District Judge to charge the jury that the master of the tug could not lawfully act as helmsman and as lookout at the same time. With respect to the first inquiry, it is our opinion that it was prejudicial to the plaintiff for the judge to permit the plaintiff's attorney to argue to the jury that the duty of the tug to maintain a

proper lookout was not adequately performed, because the only lookout was the master, and then to charge the jury only in general terms on the subject without calling their attention to the circumstances stressed by the attorney. Thereby the great importance of the proper performance of the essential duty to maintain a lookout was insufficiently shown while at the same time, in other parts of the charge, the burden upon the plaintiff to show a causal connection between the lookout maintained and the accident was expressly emphasized. For this reason we think the case should be remanded for a new trial.

■■ It does not follow that the lookout instruction requested by the plaintiff should have been granted in the form in which it was presented to the court. It is true that in numerous cases it has been held that a vessel in motion in a traveled area should have a lookout at the location on the vessel, usually in the bow, best suited to see and hear an approaching object and that the lookout should have no other duties, particularly such as those which devolve upon the pilot or others on the bridge. See the authorities assembled in Osaka Shosen Kaisha, Ltd. v. The Elene, D.C.Md., 190 F.Supp. 201. Examination of these decisions, however, reveals that these rules have been laid down with respect to vessels of considerable size whose navigators are usually occupied with the performance of various other exacting duties, and so it is generally held that an arbitrary rule cannot be applied to every case and that the question of the sufficiency of the lookout in any instance is one of fact to be realistically resolved under the attendant circumstances, bearing in mind that the performance of lookout duty is an inexorable requirement of prudent navigation. Thus in Bradshaw v. The Virginia, 4 Cir., 176 F.2d 526, 529, and in The Pocomoke, D.C.E.D.Va., 150 F. 193, 197, it is indicated that the size of the vessel and the opportunity of the navigator to have a full view of the sea should be taken into consideration in determining the need for a separate and independent lookout. See also the decisions in the First and Fifth Circuits in Stevens v. United States Lines, 1 Cir., 187 F.2d 670; Zigler Co. v. Barker Barge Line, 5 Cir., 167 F. 2d 676; Smith v. Bacon, 5 Cir., 194 F.2d 203; Parker Bros. & Co. v. DeForest, 5 Cir., 221 F.2d 377. We conclude, therefore, that the District Judge was not in error in refusing to instruct the jury as a matter of law that the performance of the duty of lookout was inadequately performed, since it was undertaken by the master of the tug in addition to other active duties.

■ We think, however, that the lookout instruction actually given by the judge did not adequately set forth the duty resting upon the tug. In effect, the judge instructed the jury that a proper lookout must always be maintained by all boats and that if the jury found that the tug was operating in a river frequented by small boats without a proper lookout, then the owner of the tug would be liable provided the lack of proper lookout was the proximate cause of the accident.

In our judgment these instructions failed to set out the rules to be applied in case the jury finds as a fact that the tug was proceeding without a proper lookout. It has been suggested that, under Article 29 of the Inland Rules, the failure of a vessel to keep a proper lookout constitutes a violation of the Inland Rules and places the burden upon the ship under the doctrine laid down in The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, to show not only that the violation did not contribute to the injury but could not have contributed thereto. The judge correctly gave such an instruction with respect to the failure of the tug to blow the whistle before rounding the curve in the river and the failure of the motorboat to carry a light. He did not give this instruction in regard to the failure of the tug to have a proper lookout if such failure existed in fact.

It has been held in a number of decisions in the Second and Fifth Circuits that failure to have a proper lookout is a statutory fault or, in any event, is such a

grave default in careful navigation as to impose upon the ship the same obligation as rests upon one which has been guilty of a statutory fault. See Zigler Co. v. Barker Barge Line, 5 Cir., 167 F.2d 676; Smith v. Bacon, 5 Cir., 194 F.2d 203; Parker Bros. & Co. v. DeForest, 5 Cir., 221 F.2d 377; Ulster Oil Transportation Corp. v. The Matton No. 20, 2 Cir., 210 F.2d 106; Ira S. Bushy & Sons v. United States, 2 Cir., 172 F.2d 447; Gulf Oil Corp. v. The Socony No. 16, 2 Cir., 162 F.2d 869; Afran Transport Co. v. The Bergechief, 2 Cir., 274 F.2d 469; Dwyer Oil Transport v. The Edna M. Matton, 2 Cir., 255 F.2d 380.

■■ In our view the violation of the duty, although a serious one, is not a statutory fault with the extreme consequences imposed by The Pennsylvania rule. The purpose of Article 29, which refers to the negligence of a vessel to keep a proper lookout, was not to make an addition to the statutory rules of navigation theretofore set out, but to make certain that compliance with those rules would not excuse the failure of the ship to comply with the other well known rules of good seamanship which exist irrespective of statute. We do not, however, minimize the duty of a vessel to have a proper lookout. On the contrary, we hold that the omission to perform this duty is so grave a default as to give rise to a strong inference that it contributed to the accident and to impose upon the vessel the heavy burden to show by clear and convincing evidence that it did not so contribute. Such a holding is surely justified in view of the more drastic rule laid down by experienced admiralty courts as a necessary safeguard for careful navigation. Accordingly, the jury should have been instructed in the pending case that if they found that the lookout duty was not properly performed by the tug, the burden rested upon it to exculpate itself from liability. The failure to give such a charge was particularly prejudicial in the present case, because the attention of the jury was not specifically called by the judge to the fact that the tug did not have an independent lookout,

and because the instruction actually given was in conflict with the argument which plaintiff's attorney had been allowed to present to the jury.

The judgments of the District Court are reversed and the case is remanded for new trial.

Reversed and remanded.