James R. NICHOLES, Plaintiff,

v.

M/V MAYA, her engines, boilers, tackle, equipment, furniture, freights, and apparel, in rem, and Egon Oldendorff (Liberia), Inc., in personam, Defendants.

C/A No. 2:95–626–18.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 13, 1996.

John Hughes Cooper, Sullivans Island, SC, Philip A. Middleton, Charleston, SC, for plaintiff.

Gordon Schreck, Julius Hines, Charleston, SC, for defendants.

## ORDER

NORTON, District Judge.

This admiralty action is before the court for Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52. A bench trial was held before this court November 4–5, 1996. Because this court concludes that the commercial cargo vessel MAYA and those navigating her were not negligent on the date in question, the court finds in favor of Defendants.

## I. FINDINGS OF FACT

1. Plaintiff, James R. Nicholes, is a 35 year-old citizen and resident of Charleston County.

2. Defendant Motor Vessel MAYA is a Liberian-flag containership owned and operated by Defendant Egon Oldendorff (Liberia), Inc., a Liberian corporation with its principal office in Monrovia.

3. Plaintiff testified that he had "been on the water" all of his life, getting his first boat at the age of 10. He was an avid recreational fisherman, intimately familiar with the waters in and around Charleston Harbor. In February of 1994, he purchased a new 24–foot aluminum Sea Ark "john" boat, powered by a 120 horsepower outboard motor. Plaintiff "customized" his boat for commercial fishing, installing a plywood floor and a small pilot house over the steering wheel console. He put running lights on the top of this pilot house, along with a 100–watt "dome light" to illuminate the forward end of the boat for night fishing.

4. Prior to the date of the accident in question, Plaintiff had been working with his cousins, Mark Moser and Grady Robison, crabbing, oystering and clamming, as the seasons permitted. Much of this commercial fishing activity took place in and around Charleston Harbor.

5. In the fall of 1994, the shrimp-baiting season opened in Charleston, and Plaintiff and his cousins purchased licenses and began shrimping on a daily basis, as weather permitted.[1]

---

1. "Shrimp-baiting" is a recreational activity named for the practice of attracting shrimp with the use of a fishmeal "bait". The bait is combined with clay or "pluff mud" into balls, which are then dropped into shallow water where shrimp are feeding. The location of these bait balls is marked with long poles or stobs, which are set out in a line for easy identification. This activity takes place at night, when shrimp tend to school. The shrimper works out of a small boat, frequently of the flat-bottom "john" boat variety, using a lantern or some other light source. After giving the shrimp an appropriate time to be attracted to the bait, the shrimper throws a cast net at the location of the bait, hopefully producing a catch. Because of the proliferation of shrimp-baiting in recent years, and fearing an impact on the commercial shrimping industry, the State Legislature and South Carolina Department of Natural Resources began regulating the activity, limiting the season, the amount of shrimp taken, and requiring a license.

6. On the night of October 19, 1994, Plaintiff took his boat and, accompanied by his cousins Moser and Robison in Robison's 16–foot outboard, went out to their favorite shrimp-baiting spot off the southeast end of Shutes Folly Island, also known as Castle Pinckney, in Charleston Harbor.[2] They had been shrimp-baiting in this same spot for years. They arrived at Castle Pinckney around 2300 hours, intending to shrimp the three to four hour window prior to and after low tide, which was at 0250 hours in the early morning of October 20. The weather was good, with clear visibility and minimal wind and seas in Charleston Harbor.

7. Upon his arrival off Castle Pinckney, Plaintiff anchored his boat at a location approximately 150 feet east of the rear marker of Range C, a navigational aid used to assist outbound commercial shipping traffic transiting Horse Reach and Shutes Reach.[3] At trial, Plaintiff identified the site of his anchorage by drawing a small circle on the chart near the rear range marker.

8. Plaintiff testified that he tested the water with a 16–foot bamboo pole before dropping his anchor, and the pole did not touch the ground. He estimated the water to be 15–20 feet deep. Plaintiff stated that he had never had problems in that location with wakes from ships, and had never seen breaking wakes on any prior occasion.

9. Meanwhile, Robison and Moser were "stobbing" out poles for shrimp baiting. Plaintiff testified that his companions were working in about 5 feet of water.

10. According to the Charleston Harbor chart, Plaintiff's anchorage was immediately adjacent to the main shipping channel designated for deep draft ocean going vessels entering and leaving Charleston. Plaintiff acknowledged at trial that he was aware of the shipping traffic transiting the harbor and of the wakes created by large commercial cargo vessels. He had observed ship wakes on previous occasions when he engaged in recreational and commercial fishing activity in and around the harbor.

11. Plaintiff testified that he expected wakes as high as 2–4 feet from shipping traffic passing Castle Pinckney. He also acknowledged that he was aware that when wakes from passing ships reach shallow water, they typically tend to "cap" or "break," and he admitted having seen 2–4 foot waves breaking in water depths of 3–4 feet near Castle Pinckney. Plaintiff conceded that wakes breaking in shallow water could pose a danger to small boats, but insisted that on the night in question, he had anchored his boat in relatively deep water where breaking wakes from passing ships should not have posed a problem for him.

12. Two Charleston harbor pilots who testified at trial, both with years of experience not only in navigating the channel in this vicinity but also operating their own pleasure boats at that location, stated that the water depths in this area were accurately reflected on the Charleston Harbor Chart as being 6 feet or less. While recognizing that the contour of an ocean bottom is not completely level, the court nevertheless finds that the water depths at low tide in the area where the Plaintiff indicates he was anchored were generally as shown on the chart and can best be described as "shallow."[4]

13. After anchoring, Plaintiff set about making up bait mud balls, sitting at the bow of his boat with the dome light shining down on him. He testified that the bow of his boat, anchored against the ebbing tide, was pointing towards Castle Pinckney, with the stern towards Crab Bank and the adjacent ship channel.

14. Although Plaintiff recalls five cargo ships passing Castle Pinckney earlier that evening, he admitted that he paid little atten-

---

**2.** A portion of the Chart of Charleston Harbor (Chart No. 11524), Plaintiff's Exhibit 1–A, is made a part of this Order for clarity and ease of reference.

**3.** The rear range marker, as shown on the Charleston Harbor chart, is a 25' marker constructed of wooden pilings, topped with a flashing light for visibility.

**4.** It is impossible for the court to reconcile the testimony of Plaintiff and his witnesses with respect to the depth of the water where Plaintiff states he was anchored with their description of a large breaking wave. The only way to do so is to conclude the water in the area where Plaintiff anchored was relatively shallow as shown in the harbor charts.

tion to them or to other shipping traffic which may have been using the channel. Plaintiff was concentrating on making up his bait balls, and since he believed that he was anchored in a relatively deep spot, he had no reason to be concerned about the dangers associated with wakes from passing ships.

15. Plaintiff and his companions testified that during their shrimp-baiting activity that evening, they kept their running lights on and that the 100–watt dome light on Nicholes' boat was burning.

16. Plaintiff testified that at approximately 0100 on the morning of October 20, he left the front deck and went to the stern of his boat to relieve himself; that while in the stern of his boat he saw off in the distance something dark and moving, but that he could not identify it. After he looked at the puzzling dark shape for some time, he heard the sound of a wave breaking and then saw in the moonlight white portions of a "huge" breaking wave approaching him. At the same time, out of the "corner of his eye," Plaintiff observed the MAYA passing. The wave was coming from the Mt. Pleasant/Sullivans Island direction. The stern of Plaintiff's boat was facing the direction of the wave, which was moving west from the shipping channel.

17. Realizing that a breaking wave was approaching, Plaintiff rushed to the bow of his boat to haul in his anchor. He had just gotten the anchor in and had gone back to the pilot house to start his engine when the wave hit his boat, filled it with water, and "surfed" it into one of the pilings of the nearby range marker. The impact dented the bow of his boat and caused him to be thrown against the pilot house, injuring his neck, back, and shoulder.

18. Plaintiff's cousins testified that they also observed the wave send Plaintiff's boat into the range marker. Plaintiff, Robison, and Moser all testified that the wave was very

large and came from the general direction of the harbor entrance (from the east) and moved toward peninsular Charleston (to the west). The only inbound ship at this time was the MAYA and the only known cause of such a wave was a large ship. Robison, though engaged in putting out poles upon initially noticing the wave, had no difficulty maneuvering his boat so as to avoid any adverse effect from the approaching wave.

19. Photographs of the collision damage to the bow of the Nicholes boat depict a large indentation where the bow of the Nicholes boat was forced around the shape of the piling. (Pl.'s Ex. 16–D).

20. Sgt. Ben Moise investigated the accident and interviewed Plaintiff just after the casualty. Sgt. Moise observed the plywood cabin and decks loosened by the impact and a quantity of barnacles and oyster shells on the front deck of Plaintiff's boat near the indentation. Sgt. Moise went to the range marker at low tide several days later and observed that the piling on the channel side of the range marker had been shaved of all of its shells for about 18–24 inches. This confirmed Plaintiff's story that the barnacles and oyster shells in the bow of Plaintiff's boat came from the piling on the range marker.

21. The MAYA was bound for the Wando Container Terminal in Charleston. According to the ship's log, she arrived at the Charleston Sea Buoy shortly before midnight on October 19, and at 2354 hours, Charleston Harbor Pilot W. Crayton Walters, III boarded to navigate the ship to her intended berth.[5]

22. Along with Pilot Walters on the bridge of the MAYA during her inbound transit were a bridge watch officer, a helmsman, a lookout, and Capt. Erich Struempell, a seasoned German ship captain with some twenty-five years of experience commanding cargo ships of all types and sizes.[6]

5. South Carolina has a state compulsory pilotage law which requires foreign-flag commercial cargo vessels such as the MAYA to take aboard a licensed harbor pilot for transit in and out of Charleston Harbor. Walters was fully licensed and qualified by both the South Carolina State

Pilotage Commission and the United States Coast Guard as pilot for Charleston Harbor waters.

6. Capt. Struempell testified that he posted his lookout on the bridge because visibility from the bridge of the MAYA was better. Plaintiff's counsel suggests that failure to post a lookout on the

23. The MAYA is a standard gearless containership of 33,000 deadweight tons, having an overall length of 616 feet and a beam of 93.5 feet. She was built in 1984 and is powered by a direct-drive diesel engine, turning a single screw. There was no evidence that there was anything unusual about her hull configuration which would cause her to produce any unusually large wake at normal speeds.

24. The MAYA's arrival draft at Charleston was 24 feet forward and 31 feet aft and all of her navigational equipment, including radar and VHF radios, were functioning. The radios were constantly monitored on Channels 13 and 16 by the personnel on the bridge.

25. The ship's speed was controlled from the bridge by selecting settings on the engine room telegraph. When a "bell" order was given by the Pilot or Master, the bell setting would be selected on the engine telegraph, thereby communicating the order to the engine room, where the engine was adjusted accordingly, determining RPM's of the screw and, ultimately, the ship's speed through the water. Capt. Struempell testified that the bell settings on the bridge telegraph, and the approximate equivalent ship speeds through the water, were as follows: sea speed, 18 knots; maneuvering speed, 14 knots; half-ahead, 10 knots; slow-ahead, 8 knots; and dead-slow ahead, 6 knots.

26. The transit from the Charleston Sea Buoy to the entrance of the Charleston Harbor jetties, a distance of approximately 10 miles, was uneventful. Walters had been monitoring the ship's radios, and as the MAYA approached Buoys 15 and 16, just inside the jetties, he was contacted by Capt. Jamie Edens of Charleston Sea Tow. Capt. Edens, a Coast Guard-licensed captain, testified that his 28 foot tow boat was ahead of the MAYA and inbound on Mt. Pleasant Range, with a 55–65 foot commercial fishing vessel in tow. Concerned about the possible effects of a wake from a large ship as she passed by them in the confined channel,

Capt. Edens requested that the MAYA reduce her speed to a "slow bell" and Pilot Walters complied. By the time the MAYA passed Capt. Edens, near the intersection of Mt. Pleasant Range and Rebellion Reach, the MAYA had slowed to 7–8 knots. As the MAYA overtook and passed Sea Tow, Edens used a remote spot light to observe the MAYA's wake, which he described as virtually non-existent. An experienced boater, Capt. Edens testified that there was nothing about the wake that would have caused any problem for a boat the size of Plaintiff's under normal circumstances.

27. In addition to his communications with Capt. Edens on the MAYA's inbound transit, Pilot Walters also had occasion to communicate with other harbor traffic. Charleston Harbor pilots were aboard the containerships MARGARET LYKES and CLIFFORD MAERSK, both outbound from their berths in Charleston Harbor. After passing Capt. Edens, Pilot Walters passed the MARGARET LYKES in Rebellion Reach, south of Buoys 1 and 2. Just prior to that passage, he made several minor bell adjustments, first ordering a dead-slow bell, then back to slow, but these adjustments had little appreciable affect on the MAYA's speed through the water, which he estimated to be in the range of 7–8 knots. He testified that the MAYA was on a slow bell as he passed the MARGARET LYKES, and remained on that slow bell, maintaining a speed of approximately 7–8 knots as she continued up Rebellion Reach.

28. The next several reaches of the channel (Folly Reach, Shutes Reach, Horse Reach, and Hog Island Reach), constituting the passage between Castle Pinckney and Hog Island, present a rather tricky series of "S" turns. Pilot Walters, Capt. Smith and Capt. Struempell all testified that it was necessary to maintain the ship at slow ahead in order to maintain safe steerageway through this channel.

bow contributed to the accident. However, Pilot Walters testified that upon boarding the MAYA, he requested that a man be posted at the bow with direct radio communication with the bridge, in the event of an emergency. He considered this crewmember to be serving as an

additional lookout. In any event, as the court's decision indicates, whether or not either lookout on the MAYA had seen Plaintiff and his companions, the navigation decisions made by the pilot or Master as the ship transited through the Harbor would not have been altered.

29. Impacting Walters' navigation decisions were the currents and other outbound traffic. The tide was still ebbing, and the CLIFFORD MAERSK was now approaching Castle Pinckney; any slower speed at that point, according to Pilot Walters, could have compromised the MAYA's safe passage, and placed both vessels at risk of a collision. Accordingly, Walters maintained the MAYA on a slow bell, at 7–8 knots, as he passed the area where Nicholes' boat was anchored. He safely passed the CLIFFORD MAERSK, port-to-port, near Buoy 6.

30. Capt. Struempell testified that upon reaching Rebellion Reach, the MAYA continued on a slow bell, at 7–8 knots, and that they were probably making less speed than that as they transited Folly and Shutes Reaches past Castle Pinckney. He was of the opinion that reducing the vessel's speed to dead slow ahead at that point in a narrow channel would have compromised the MAYA's safe steerageway, particularly in the face of the oncoming outbound traffic.

31. There was a factual dispute at trial as to the actual size of the MAYA's wake as she transited past Castle Pinckney and the location of Nicholes' boat. Capt. Edens, Pilot Walters and Capt. Struempell all testified that the MAYA's wake at slow speed was minimal, not unusual, and not such as could have been expected to cause a problem for any responsible small boater. Plaintiff and his companions, on the other hand, described the wake as a "humongous," 8-foot wave, bigger than any they had ever seen in this location previously.

32. After receiving a complaint of wake damage from Plaintiff, and faced with conflicting descriptions as to the size of the MAYA's wake, the United States Coast Guard Marine Safety Office in Charleston undertook an investigation of the incident, assigning the task to First Class Petty Officer David L. Hood, an experienced marine investigator. In an effort to determine whether the MAYA may have generated an excessive wake as it passed Castle Pinckney, Hood arranged to meet the MAYA at the Sea Buoy on her next call at Charleston on the night of November 4–5, 1994, and to observe her inbound transit for himself. According to Hood's testimony, though conditions that night were not identical, he considered them sufficiently similar to be able to make a reasonable assessment, by visual observation, as to the size of the MAYA's wake at slow speed as she transited the Charleston Harbor ship channel.[7] Hood testified, based on his personal visual observation, that the wake generated by the MAYA was not unusually large or abnormal for a vessel of her size transiting a harbor. He did not find it necessary to request those in command to decrease the MAYA's speed. On several occasions during the transit, the MAYA passed

---

7. Plaintiff's counsel objected to the admission of Hood's testimony arguing that his observations and conclusions were unreliable and untrustworthy, since the circumstances of the MAYA's transit on November 4–5 were substantially different than on the night of the accident. In fact, conditions on the two transits were quite similar. Both occurred at night, on an ebbing tide, with similar weather conditions. The ship's draft during Hood's attendance was 23.6 feet forward, virtually identical to that on the night of the accident. The draft aft was 29 feet, only 2 feet less than on October 20. Perhaps most significantly, the MAYA's total transit time from the Sea Buoy to her berth at the Wando Terminal was 105 minutes on November 4–5, 3 minutes faster than on October 19–20, suggesting that the pilot onboard November 4/5 navigated the MAYA in generally the same fashion as did Pilot Walters on the night of the accident. In any event, Hood's description of the size of the MAYA's wake on the night of November 4–5 did not constitute speculation or hearsay. Rather, his testimony constituted first-hand, personal observation. *See United States v. Kiliyan,* 456 F.2d 555, 562 (8th Cir.1972) (holding that opinion testimony of a qualified expert based on personal observation is admissible.) Any objection based upon the fact that conditions may not have been identical to the night of the accident in question would go only to the weight of the evidence. The court is of the opinion that Hood's observations were both trustworthy and relevant to the court's search for the truth as to the reasonableness or excessiveness of the MAYA's wake as she passed Plaintiff's boat on the night in question. The court also takes this opportunity to observe that, in making its findings of fact, it has not considered the accident reports submitted by the South Carolina Department of Natural Resources investigating officer, Sgt. Ben Moise, nor the Marine Casualty Investigation Report of Mr. Hood. The South Carolina DNR reports are inadmissible under S.C.Code § 50–21–130(4), and the Coast Guard Marine Casualty Investigation Report is inadmissible under the recently enacted Coast Guard Authorization Act of 1996.

small vessels in the harbor, and Hood testified that he observed no adverse impact to those vessels from the MAYA's wake.

33. Also relevant to the size of the MAYA's wake was the testimony of Moser and Robison as they pursued her after the accident. Both had occasion to cross the wake in pursuit of the MAYA shortly after the accident, Robison in his own 16–foot outboard and Moser operating Plaintiff's boat. Neither experienced any unusual problem crossing the wake on that occasion and neither testified that the MAYA's wake was unusually large.

34. Finally, Sgt. Moise, an experienced fish and wildlife enforcement officer with the South Carolina Department of Natural Resources, testified that he investigated the accident on the night of its occurrence. He testified that at the time in question, it would have been customary for numerous small boats to be shrimp-baiting in the shallows off Hog Island from the Cooper River Bridge to the Yorktown, and along the west side of Crab Bank. Despite the presence of other shrimp-baiting activity in the vicinity and adjacent to the channel, his office received no other reports or complaints of an unusual or excessive wake from the MAYA on the night of Plaintiff's accident. Had the MAYA's wake been as large and unusual as that described by the Plaintiff and his companions, it would be expected that other complaints would have been received.

35. Capt. Whitmarsh S. Smith, III, who has been a Charleston Harbor Pilot for twenty-four years, testified as Defendants' navigation expert. Capt. Smith testified that the MAYA was being navigated prudently and properly on the night in question, and that her transit past Castle Pinckney at a slow bell speed of 7 to 8 knots was not excessive under then existing circumstances. Indeed, it was his opinion that it would have been imprudent and dangerous, under those circumstances, to have attempted to slow the vessel's speed further. He testified that had he been piloting the MAYA on the night in question, he would have handled her the in the same way as did Pilot Walters, and that the presence of Plaintiff and his companions as indicated by them on the chart neither warranted nor required any different action.

Capt. Smith also testified that there would have been no appreciable difference in the size of the wake generated by the MAYA if she had been proceeding at dead slow.

36. Based on the testimony of the several witnesses as related above, and a review of the relevant trial exhibits, the court finds that the MAYA, as she transited Rebellion Reach and Folly Reach, past the southeast end of Castle Pinckney, was proceeding on a slow engine bell at a speed through the water of approximately 7 to 8 knots, that this speed was reasonable and prudent under the circumstances, and such as was necessary to maintain adequate steerageway in the face of prevailing currents and on-coming, outbound commercial ship traffic. The court further finds that to have reduced the MAYA's speed further at that point would have been to compromise her safe navigation and, in particular, her safe passage of the outbound CLIFFORD MAERSK and would not have created an appreciably smaller wake.

## II. CONCLUSIONS OF LAW

1. Claims such as these for damage to a pleasure craft anchored in Charleston Harbor and personal injury to the owner/occupant of the anchored pleasure craft caused by the wake of a passing container ship meet the situs and nexus requirements for admiralty tort jurisdiction of this court. *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990); *In re Bird,* 794 F.Supp. 575 (D.S.C.1992).

2. The court has jurisdiction over the parties and subject matter of this case pursuant to Title 28 U.S.C. § 1333.

3. Because these claims are within the admiralty jurisdiction, they are governed by substantive admiralty law. *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 864, 106 S.Ct. 2295, 2298–99, 90 L.Ed.2d 865 (1986); *Byrd v. Byrd,* 657 F.2d 615, 617 (4th Cir.1981).

4. Plaintiff alleges that he sustained personal injuries and property damage as a result of a wake generated by the MAYA. Clearly, if a vessel is operated in a negligent fashion, and its wake causes damage to a person or property, the vessel may be held

liable. *Sweeney v. Car/Puter Int'l Corp.*, 521 F.Supp. 276 (D.S.C.1981). In *Sweeney*, two owners of large yachts were each found liable for spinal injuries to a passenger in a small boat who was tossed around by the combined wakes of those yachts. The court stated,

A vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion through the water at the particular place and under the particular circumstances where the injury occurred, and her officers are required to take into consideration others who may reasonably be expected to be affected, and to take all reasonable precautions to avoid their injury even though former experience has shown that in the ordinary and usual course of events they are likely to escape injury or that the larger vessel was proceeding on ordinary course and at her customary speed. Smaller craft have the right to assume larger craft aware of their presence will observe reasonable precautions and are under no duty to warn the larger vessel of the danger.

*Sweeney*, at 285, quoting *Moran v. The M/V Georgie May*, 164 F.Supp. 881, 884–85 (S.D.Fla.1958).

5. Plaintiff argues based on *Sweeney* that proof of injury resulting from wake damage switches the burden to Defendants to prove that they were not at fault. In *Sweeney*, the court stated, "[i]t has been held that a *prima facie* case is established by proof of injury caused by a swell from a passing vessel." *Id.* at 285–86. The court then cited *West India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673 (5th Cir.1951), where a steamship was held liable for damage to a docked fishing vessel by displacement waves. The court in *West India Fruit* noted that the master of the steamship had timely notice of the presence of the fishing vessel, and "it was his obligation to see to it that his vessel did not pass at such speed that danger would result from her suction or swells and he is responsible for their effects upon innocent vessels." *Id.* at 674. The court then stated that the injury to the fishing boat from swells established a *prima facie* case against the steamship: "And since she was the moving vessel

she must exonerate herself from blame by showing that it was not in her power to prevent the injury by adopting any practical precautions." *Id.* Therefore, Defendants may rebut the presumption of negligence by offering proof of reasonable care under the circumstances, thereby absolving themselves of fault.

6. Plaintiff argues that Defendants failed to maintain a proper lookout, contributing to the cause of the accident. The duty to maintain a proper lookout in inland waters such as Charleston Harbor is imposed by Rule 5 of the Uniform Navigation Rules, Title 33 U.S.C. § 2005. Inland Rule 5 requires that "every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision." *Id.; Schumacher v. Cooper*, 850 F.Supp. 438 (D.S.C.1994).

7. As the court stated in *Anthony v. International Paper Co.*, 289 F.2d 574 (4th Cir.1961), "the question of the sufficiency of the lookout in any instance is one of fact to be realistically resolved under the attendant circumstances, bearing in mind that the performance of lookout duty is an inexorable requirement of prudent navigation." *Id.* at 580. If a vessel has not properly performed its lookout duty, the burden rests on that vessel to exculpate itself from liability. *Id.* at 581.

8. Plaintiff argues that the MAYA failed to maintain a proper lookout in this case because the designated lookout was posted on the ship's bridge and not on the bow. However, the court notes that there is no requirement under Inland Rule 5, or the case law construing that rule, requiring the posting of a lookout at a specific location. Rather, the persons in charge of the vessel's navigation are obligated to position a lookout at a point best suited for that purpose, having due regard for the circumstances of the case and the conditions of the weather. *See, The VEDAMORE*, 137 F. 844 (4th Cir.1905). In the case at hand, Capt. Struempell testified that the lookout was positioned on the port wing of the bridge some six stories above the main deck, because that vantage

gave him the best visibility under the existing circumstances. Plaintiff's boat would have been located on the port side of the MAYA as she passed Castle Pinckney. As the court stated in *Maritrans Operating Partners L.P. v. M/T FAITH I*, 800 F.Supp. 133, 142 (D.N.J.1992), "A Rule 5 violation does not occur when those aboard a vessel have an unobstructed view . . . even though no bow lookout is posted." The court finds that Defendants maintained a proper lookout on the night in question.

■ 9. This court finds that Defendants have shown that they were not negligent on the date in question. The overwhelming evidence establishes that the MAYA was being navigated in a careful and prudent fashion, with due care for existing circumstances. She was proceeding on a slow bell within the designated shipping channel as she passed Castle Pinckney. To have reduced the MAYA's speed below slow ahead as she approached that stretch of the channel adjacent to Plaintiff's anchorage could have dangerously compromised the MAYA's steerageway, placing the MAYA and her crew, as well as approaching outbound traffic, at risk of a collision. Additionally, there was overwhelming evidence that the size of the MAYA's wake would not have been appreciably different had she been proceeding at dead slow.

10. The court concludes that any wake generated by the MAYA as she passed Castle Pinckney and Nicholes' anchored boat was normal and expectable under the circumstances, and such that should have been anticipated by recreational boaters in shallow waters. Indeed, to impose liability upon the MAYA on the facts as found in this case would, in effect, be to impose upon the moving vessel a rule of liability without fault for any damage caused to an anchored vessel by any wake under any circumstances. Because, as a practical matter, large commercial ships cannot transit a narrow channel without displacing water and creating some wake, the imposition of such a liability rule would have far-reaching implications for interstate and foreign ocean commerce.

### III. CONCLUSION

For the reasons stated above, the court concludes that Plaintiff's injuries and damages were not caused by any negligent acts of Defendants. Accordingly, judgment is entered for Defendants. Each side shall bear its own costs.

It is therefore,

**ORDERED,** that judgment be entered for Defendants.

**AND IT IS SO ORDERED.**