**BURNS BROS. v. THE SYSTEMATIC et al.**
**THE BURNS BROS. NO. 86.**
**THE PRESIDENT MONROE.**
No. A–18490.

United States District Court
E. D. New York.
June 25, 1951.

---

(John R. Sheneman, New York City, of counsel).

BYERS, District Judge.

This is a swell damage cause asserted by libellant as owner of its coal barge Burns Bros. No. 86, said to have been sustained on March 21, 1947, when she was being towed, light, by the Tice tug Systematic from the Burns Yard in South Brooklyn to Pier 18, Jersey City, there to be laden.

The swells are said to have been caused by the S.S. President Monroe, of the American President Lines, Ltd., as she proceeded up the bay in the ship channel off Governors Island, at about 2:15 p. m., the day being clear, the tide ebb in Buttermilk Channel, and the wind out of the northwest, so light as not to affect the navigation of these vessels.

The tug had the barge alongside to starboard, bow ahead, made up with towing and bow and stern lines, with adequate and sufficient wood fenders properly rigged for the purpose in hand. The make-up of the tow is not criticized, nor the 350 h. p. of the tug's engines.

The barge is 104.1 feet by 24.6 feet by 12.6 feet height of sides, drew about 3 feet when light, and had a freeboard of 12 inches amidships. The tug is 87.3 feet by 21.5 feet by 11.3 feet depth.

Departure from Gowanus was at about 1:50 p. m., S.T., and continued without incident until the ship was observed at a distance of about half a mile, moving up the river on a course which would carry her across that of the tow; the latter was making about 3 miles per hour at the times, and the tug's engines were stopped at once, and her captain estimates that progress through the water had ceased when the ship was about a quarter of a mile away, the tow being then about 500 feet or so off the southerly end of Governors Island.

The tug's captain, Boroughs, was in charge and he observed swells coming from the ship's stern, which he said were "enormous", but stated no height in feet. He headed into them, making a slight

Alexander & Ash, New York City, for libellant (Edward Ash and Diego Camarda, New York City, of counsel).

Burlingham, Veeder, Clark & Hupper, New York City, for the Systematic and claimant Tice Towing Lines, Inc.

Dow & Symmers, New York City, for the President Monroe and claimant-respondent American President Lines, Limited

helm movement to one side, and said that there were several contacts between the tug and the barge during the surging that the swells created. He was a credible witness in all respects, as was also the bargee West, who was in his cabin reading until he heard a loud crack, which he felt as well as heard while so engaged. He looked out, saw and felt the motion of the swells, which he said caused two or three poundings between the tug and his vessel, and that he at once looked into his hold and observed water entering the hull at about the 3rd stern hatch. He says that the tow was still in the water at this time.

On reaching Pier 18, he worked his pump for a time, and on making further examination below, saw 5 king-posts started and 2 or 3 planks (side, it is presumed) broken. He at once reported by 'phone to his owner, and James O'Neill, the runner, soon came to observe conditions. (He was not a witness.)

A survey was held three days later, attended for the three parties concerned, which resulted, in a report of damage consistent with this testimony.

In this connection, it should be said that prior repairs during 1945 and 1946 had been made, involving outlays of $2,052.49 and $217.68, respectively, and there is no reason to suppose that this barge was not in good condition and seaworthy as the tow left Gowanus on the day in question.

The testimony for the ship is entirely confined to her course and speed as she moved up the river. No unusual incident was observed by the Sandy Hook Pilot whose testimony alone constituted the ship's case. He said that between points marked on the Chart, Ex. 2, which indicated a course running not to exceed 900 westerly from the approximate position of the tow when it stopped, the ship was at full harbor speed, somewhat less than full sea speed of about 16 land miles per hour, according to the Pilot's testimony.

It should be said that the ship's answers to libellant's interrogatories are somewhat cryptic, for instance:

To 3(a) as to whether any one noticed the tow, the answer is: "The Mate, First Officer, Second Officer and Captain have been questioned. None of them recall any unusual events which would cause them to remember passing the tug Systematic and the barge Burns Bros. No. 86."

■ As to Interrogatory 3(g) referring to "speed over the ground when the ship sighted the Systematic", the answer above quoted was repeated by reference. Perhaps the question invited such an answer, but the fact remains that all testimony for the ship, concerning speed, is the statement of the Pilot. If computations based upon the record of sundry times when the ship was abreast of named buoys (22, 24, 26, 28, and 30) shown in response to the tug's interrogatories would not conform to the Pilot's testimony, such computations should have been made in the ship's brief for examination by opposing proctors.

■ It will thus be seen that there are no conflicting versions of one narrative, which renders itemized findings unnecessary.

The ship seemingly relies upon McLain Lines, Inc. v. The Ann Marie Tracy, 2 Cir., 176 F.2d 709, but without avail, since here there is no showing of slackening lines to the barge too late to be of use.

So far as The Firestone, 1932 A.M.C. 623 is concerned, I also find it hard to understand how at least two side planks as heavy as these could have been broken, in such a surging as the No. 86 was subjected to; however, the bargee West saw what happened and he impressed me as being a truthful man; his testimony cannot be written off on any ground that has been suggested.

The Acadia, 2 Cir., 98 F.2d 801, is not of help because there the ship passed at three-quarters of a mile rather than less than one-quarter as here.

■ The criticisms of the tug by the ship are argumentative and are addressed to her failure to see the ship until the latter was a half a mile away. That was not negligent in view of the course and destination of the tow. The failure to blow a danger signal could not have contributed to the speed or size of the stern waves complained of, which by then were

rolling along. It might have been misinterpreted, if blown, as asserting a crossing situation.

Of course the heading of the tug as testified to by her Captain can be disbelieved in an arbitrary manner, but no reason based upon observation of the witness would justify this Court in rejecting his testimony concerning the navigation of his tug. Incidentally, I do not think he is right as to the damage showing on the barge when he boarded her at Pier 18, Jersey City; nor do I think that he intended to mislead the Court on the subject but rather that his inspection was not thorough. He used no flashlight because he said it was not necessary, and he was alone. He saw no broken planks or knees, but did see seepage of water.

The fault of the ship was in not slowing down in time to avoid throwing up these swells in the vicinity of Buttermilk Channel where harbor traffic is customarily moving, and this tow was in plain sight, fairly close at hand. The ship was light and her propeller was exposed which may have enhanced the swells; if so the need for slower speed was the more pressing.

The libellant may take the usual decree against the S.S. President Monroe and her owner, with costs; the libel will be dismissed against the tug Systematic, without costs. Settle decree.