Frank A. LOWERY, as owner of THE
INEZ LOWERY and THE MAY
LOWERY, Libellant,

v.

HUDSON RIVER DAY LINE, Inc., and
THE PETER STUYVESANT,
Respondents.

No. 19407.

United States District Court
E. D. New York.

May 18, 1955.

O'Connor & Randolph, New York City, for libellant, Edward L. P. O'Connor,

Anthony J. Randolph, New York City, of counsel.

McNutt & Nash, New York City, for respondents, Eli Ellis, H. J. Scanlon, New York City, of counsel.

GALSTON, District Judge.

This is a libel in rem and in personam to recover for damages sustained by the barges Inez Lowery and May Lowery by reason of excessive swells created by the negligent operation of the S.S. Peter Stuyvesant, owned and operated by the Hudson River Day Line.

On the afternoon of July 9, 1949 the diesel power canal barge, Frank A. Lowery, was bound north on the Hudson River with a tow of six barges.

These barges were on two hawsers of about 200 feet in length, running from the stern of the power boat to the bow of the head barge. The barges were made up in tandem fashion in the following order: Dickey, Inez, Betty L., Gabe Heffern, May Lowery and Marion O'Neil. Lug lines ran between these barges, from the bow corner of each vessel to the stern of the barge ahead. Lug lines were on both the port and the starboard side, and in addition there were two cross lines. The libellant, Frank A. Lowery, who was stationed on the diesel power barge, testified that there were fenders between the boats, and that the bow of each vessel was protected with iron guards.

The voyage of the tow began at Columbia Street. The tow was navigated through New York Harbor and up the Hudson River until the time of the damage to the two scows in question. The Peter Stuyvesant passed the tug and tow in the morning without accident.

The difficulty arose in the late afternoon of July 9, when the Peter Stuyvesant was southbound from Bear Mountain, and passed the Lowery tow at a distance of 300 feet off the starboard side of the Lowery. This distance of 300 feet was the estimate made by Captain Lowery. Captain Robinson of the Stuyvesant, on the other hand, estimated the distance at between 500 and 600 feet. Whichever distance is accepted, the fact

remains that the evidence establishes that the Stuyvesant was close enough to raise heavy swells, which caused the barges in the tow to bounce and toss, to part lines and to cause a cleat to be torn from the stern of Inez, the second barge.

To establish the time of the passing of· the vessels became a matter of importance. Captain Robinson testified that the Stuyvesant left Bear Mountain at 4:35 P.M. She passed Verplancks, a distance of about five and a half miles away, at 4:53 P.M. Thus in an interval of eighteen minutes, according to Robinson, the Stuyvesant was making seventeen or eighteen miles an hour.

The point of passing, as fixed by Robinson, is indicated on libellant's Exhibit 1, which he marked with an asterisk. But, as is pointed out in libellant's brief, at the speed which Robinson said he was making, the place which he marked as the point of passing appears to be inaccurate. In all likelihood the Stuyvesant had traveled no more than ten miles from Bear Mountain to the point of passing, making allowance for the two occasions in which the Stuyvesant was slowed down before passing the Lowery. Thus when a point of about ten miles from Bear Mountain is measured on the chart, it is found to be in the vicinity designated by the libellant's witness Lowery.

I must reach the conclusion that the libellant established the time and place of passing.

There are some inconsistencies. in the testimony of Reardon, who was the fleet captain of the tow, and that of Lowery. Reardon was stationed on the Betty L., the third barge in the tow. He was preparing his supper in his cabin when he heard a distress signal blown by his tug. Thereupon he went out on deck immediately and observed the Stuyvesant passing. He placed the Stuyvesant about 100 feet past the last barge in the tow. On the other hand, Lowery stated that he also was below deck at the time of hearing the danger signal. He had to put on some clothes, and by the time he reached the deck he said that the Stuyvesant was abeam of the middle of the tow. He observed at that time the Robert Fulton and the Alexander Hamilton about a mile to the north of the tow.

Respondent, therefore, capitalizes on the apparent conflicts and urges that Lowery's testimony is unworthy of acceptance. But the very diversity in estimates leads me to believe that both witnesses testified according to their best recollections, and that the stories were not fabricated, and that they did not attempt to match stories. Nor can it be inferred from the record that they came out from their cabins at the same time. They did agree that the Stuyvesant was about 300 feet to their starboard.

It is urged by the respondents that for the libellant to prevail it is necessary that the libellant make out a very clear case to warrant a decree in his favor in a case such as this which involves swell damage, citing The Portchester, 2 Cir., 1927, 18 F.2d 75; The Albany, 1928 A. M.C. 384; The Trojan, 1930 A.M.C. 381, and The Dewitt Clinton, 1930 A.M.C. 227, among others.

In The Portchester, supra, the towing tug impleaded the steamer as respondent in a libel for damages to a barge. The barge captain testified that he felt or saw no swells at the time of the alleged incident. The incident was not reported to the owners of the steamer for six months, and the tug gave no notice to the steamer of the survey because at the time of the survey she knew nothing of the steamer.

In The Albany, supra, the libellant presented two witnesses, and. the court wrote:

"Considering the testimony of Joseph McCormack, taken by deposition on behalf of libellant, that he is positive that the injury to the tow was caused by respondent's steamer Albany, bound from New York upriver on August 9, 1924, though the master of the steamer Buffalo, which had the libellant's boats in tow, testified that it was the respondent's steamer Albany, bound down the river to New York on August 20, 1924, which caused the injury, it

does not seem that libellant has presented a very clear case."

The Trojan, supra, involved alleged damage to barges moored at Troy by a steamer belonging to the Hudson River Night Line. It was said:

"The libellants should be required to make out a clear case. Undoubtedly, with the current and the turning over of the wheel, for a short time after the engines were stopped, it may have seemed to the libellants that the Trojan had speed, but there is no reason to doubt the correctness of the log, and I cannot believe that the Trojan passed with sufficient speed to injure seaworthy boats, and did not cause any line to part, nor any plank or fender to be injured."

In The Dewitt Clinton, supra, it was held:

"That there were some swells is undoubtedly true, but the water is deep off Conns Hook Island, and they were not high swells sufficient to cause the damage complained of, if the tow had been properly made up, nor were they the proximate cause of the damages to the Mary E. Cornell."

All of the foregoing cases are clearly distinguishable in the facts presented from those of the present libel.

Finally respondent urges that since libellant's tow admittedly was proceeding north on the port side of the channel it has admitted a violation of the Inland Rules which would require it to be on the starboard side, 33 U.S.C.A. § 210, Art. 25, and that libellant must prove that the violation did not contribute to the alleged occurrence. The cited case, The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, was a collision case. In the instant case respondent claims that it was in the center of the channel. Therefore, it does not seem that the location of the Lowery tow, either to the starboard or the port side of the Stuyvesant, had any causal relationship to the damage done by the swells from the Stuyvesant. It cannot be said that the Lowery tug increased the risk of damage to itself by being on the port side.

From the foregoing it must be concluded that the proximity of the Stuyvesant to the tow and its rate of speed created swells which caused the damage complained of. In relation to the question of speed of the Stuyvesant, it may be noted that it was coming down the river on that afternoon in order to meet a scheduled 8:30 P.M. cruise that evening.

The libellants may have a decree.

Concurrently with this opinion appropriate findings of fact and conclusions of law will be filed.