Edward MORAN, Libellant,

v.

THE M/V GEORGIE MAY, its engines, tackle, equipment and other appurtenances, Respondent.

No. 1458-M.

United States District Court
S. D. Florida.

March 19, 1958.

Fowler, White, Gillen, Yancey & Humkey, Miami, Fla., for libelant.

Smathers, Thompson & Dyer, Miami, Fla., for claimant-respondent.

CHOATE, District Judge.

This is an action for personal injuries alleged to have been incurred by the Libellant while a passenger in an outboard motorboat due to wash and swells arising from the negligence of the Respondent M/V Georgie May and those in charge of her. Critz Buick Company, a Delaware corporation, claimed the ves-

sel and filed answer, admitting the formal allegations and denying the allegations of negligence. The cause came on for trial on February 6, 1958, and the Court having considered the pleadings and the evidence, now files the following findings of fact and conclusions of law:

### Findings of Fact

1. On April 16, 1956, the Libellant and his wife, who were vacationing in Lauderdale-by-the-Sea, Florida, were invited by acquaintances, Mr. and Mrs. Bart Taylor, to accompany the Taylors on a pleasure ride in an aluminum outboard motorboat owned by the Taylors.

2. The motorboat was of usual design, approximately fourteen (14) feet in length, and was powered by an outboard motor operated by controls located near one of the front seats and steered by a steering wheel mounted in front of the same seat, similar to an automobile. Mr. Taylor was the operator. The Libellant was seated in the other front seat to the side of Mr. Taylor. The wives were seated in back of their husbands.

3. The party embarked in the Taylor boat from a dock in Lauderdale-by-the-Sea and proceeded in a westerly direction on a waterway until they reached the Intracoastal Waterway, running generally north and south. At this point, they proceeded in a southerly direction on the left or port side of the Intracoastal Waterway in the direction of Fort Lauderdale, Florida.

4. The Respondent M/V Georgie May is a Rybovitch Sports-fisherman, approximately forty-three (43) feet in length, with twin screws powered by two engines. At the times material hereto, she drew about three and one-half (3½) feet of water. The screws were of twenty-one (21) pitch and were twenty-four (24) inches in diameter. The Intracoastal Waterway had a project depth of seven (7) feet where the meeting occurred. The Captain of the Georgie May was familiar with his vessel and the waters being traversed.

5. The Georgie May had departed from Bal Harbor the morning of April 16, 1956, and proceeded in a northerly direction in the Intracoastal Waterway, destined for West Palm Beach, Florida.

6. The Georgie May was under time charter which was to terminate on April 18, 1956. She eventually arrived at West Palm Beach about dusk on April 16, 1956. Her log book, which contained her departure and arrival times, was not produced at the trial.

7. About 1200 on April 16, 1956, the Georgie May was delayed for approximately an hour by an inoperative bridge, and thereafter proceeded at approximately fifteen (15) miles per hour, which she maintained in meeting and passing the Taylor boat, in which the Libellant was a passenger.

8. The Georgie May, prior to the meeting of the vessels, had cleared what is commonly known as the Oakland Park Bridge, which spans the Intracoastal Waterway in the general vicinity of the residential area of the same name, north of Fort Lauderdale. The Oakland Park Bridge is the northernmost bridge over the Intracoastal Waterway in the Fort Lauderdale area, the next span being several miles further north.

9. It was a bright clear day, the waterway was straight and unobstructed. The Captain of the Georgie May sighted the Taylor boat and the Taylor boat sighted the Georgie May, while the craft were still several hundred yards apart. The Georgie May was proceeding north in the center of the channel. The Taylor boat was proceeding south on the left or port side of the waterway.

10. These courses did not change prior to the vessels' meeting. No signal of any kind was given by either craft. The Taylor boat was approximately thirty-five (35) feet abeam of the Georgie May when they passed, which distance was approximately half the distance between the Georgie May and the east bank of the Waterway.

11. The maximum speed of the Georgie May was twenty-two (22) or

twenty-three (23) miles per hour. Due to the hull design of the class of Georgie May, her maximum waves and swells are created at approximately two-thirds speed; which speed she maintained in meeting and passing the Taylor boat. This characteristic was known to the Captain of the Georgie May.

12. When the Georgie May and the Taylor boat were abeam of each other, Mr. Taylor increased the speed of his boat and turned to the right or starboard, so that the bow of his craft was perpendicular to the swells or waves created by the Georgie May. Two principal waves or swells created by the Georgie May were approximately three to five feet from trough to crest.

13. When the Taylor boat crossed these waves created by the Georgie May, the Libellant was in turn thrown forward out of his seat and then forcefully back into his seat, which was caused to be broken by the impact.

14. At the time the Georgie May and the Taylor boat met, the charterer and his son were seated aft and did not see the approach of the Taylor boat, the mate was below washing dishes and his only view was through a porthole on the side of the vessel, through which he occasionally looked. The Captain was at the controls topside.

15. As a result of his being thrown forward and back into the seat, the Libellant incurred a fracture in the level of the first lumbar vertebra. The Libellant was hospitalized in Holy Cross Hospital, Fort Lauderdale, Florida. The reasonable charge incurred for this care was $159. He was treated by Dr. Paul Shell at the reasonable charge of $43. Dr. Shell prescribed and Libellant purchased a back brace, for which the usual and customary charge was $75. X rays were taken of Libellant at the reasonable cost of $15. Upon Libellant's return to his home in Detroit, Michigan, he was examined and treated by Dr. Thomas C. Starrs, his family physician, whose reasonable charges were in the amount of $110 in connection with Libellant's injuries.

16. The Libellant was employed as a dispatcher by Ford Motor Company, at a salary of $125 per week. Dr. Starrs prescribed rest, diathermy treatment, and the continued use of the back brace. Due to his injuries, Libellant, on instructions of Dr. Starrs, did not return to work for a period of eight (8) weeks after his return to Detroit. It was necessary for the Libellant to have assistance in dressing and attending to his personal needs. Libellant's wife was regularly employed at an average weekly wage of $75 per week. She nursed the Libellant during the eight-week period Libellant was not able to work. The cost of employing a practical nurse to care for the Libellant would have been $65 a week.

17. The Libellant experienced pain and suffering in connection with his injuries, particularly during the period from the accident until his return to work. Discomfort was experienced in wearing the brace, which Libellant has worn since his injury and subsequent to his return to his employment. Libellant's employment is performed while seated and his injuries since return to his employment have not interfered with his engaging therein. Libellant, at the time of trial, sill experienced periodic pain in the lower back, and difficulty in bending.

### Conclusions of Law

1. The subject matter of this litigation is within the admiralty jurisdiction of the court.

2. Whether a vessel is responsible for damage created by her swells, depends upon the facts and circumstances of each particular case, e. g. Martin Marine Transp. Co. v. United States, D.C.E.D.Pa.1946, 66 F.Supp. 673.

3. A vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion through the water at the particular place and under the particular circumstances where the injury occurred, and her officers are required to take into

consideration others who may reasonably be expected to be affected, and to take all reasonable precautions to avoid their injury even though former experience has shown that in the ordinary and usual course of events they are likely to escape injury or that the larger vessel was proceeding on ordinary course and at her customary speed. Smaller craft have the right to assume larger craft aware of their presence will observe reasonable precautions and are under no duty to warn the larger vessel of the danger, e. g. The Chester W. Chapin, D.C.E.D.N.Y.1907, 155 F. 854; The Hendrick Hudson, D.C.S.D.N.Y.1908, 159 F. 581; The Asbury Park, D.C.W.D.N.Y. 1905, 138 F. 925; The Systematic, D.C., 99 F.Supp. 870; The Drew, D.C.S.D.N.Y. 1884, 22 F. 852; Cf. West India Fruit & S. S. Co. v. Raymond, 5 Cir., 1951, 190 F.2d 673.

4. Although the reported cases appear to have arisen in connection with property damage principally occasioned to other vessels and their appurtenances, personal injury is no less foreseeable, particularly in reference to occupants of small craft. There is no less duty to exercise reasonable precautions under the circumstances to avoid their injury than owed other vessels or property.

5. The two vessels by maintaining their predetermined courses without signal by either, at least tacitly accepted a starboard passage. In so doing, the Georgie May maintained her course in the center of the channel. Although no issue was raised concerning the fact that the Taylor boat occupied by the Libellant was on the port side of the channel at the time, this circumstance had no causal relationship to Libellant's injuries caused by her swells. Lowery v. Hudson River Day Line, D.C. E.D.N.Y.1955, 132 F.Supp. 629.

6. The Georgie May and those in charge of her were negligent in view of the relative size of the vessels, the size of the swells or waves created by the Georgie May in meeting and passing the boat occupied by Libellant at a critical speed at which she generated maximum swells or waves, and by proceeding unnecessarily close to the boat in which Libellant was a passenger, while maintaining a course in the center of the channel instead of staying to her port side of the channel during the adopted starboard passage.

7. This negligence of the Georgie May and those in charge of her proximately caused and contributed to Libellant's injuries.

8. The Libellant was a guest of the operator of the boat in which he was a passenger and any negligence on the part of such operator is not imputed to Libellant.

9. Therefore, I find that Libellant Edward Moran is entitled to a decree against the Respondent Georgie May, her claimant and stipulators, in the amount of $3,750. Decree for Libellant with costs is being entered herewith.