June Catherine SWEENEY, Plaintiff,

v.

CAR/PUTER INTERNATIONAL COR-PORATION, and Small World Creative Enterprises, Inc., Defendants and Third-Party Plaintiffs,

v.

Roy W. SWEENEY, Third-Party Defendant and Cross Claimant.

Civ. A. No. 77–2258–1.

United States District Court, D. South Carolina, Charleston Division.

Aug. 27, 1981.

Cody W. Smith, Jr. and Ellis I. Kahn, Solomon, Kahn, Roberts & Smith, Charleston, S. C., for June Catherine Sweeney.

Neil C. Robinson, Jr., Grimball, Cabaniss, Vaughan & Guerard, Charleston, S. C., for Car/Puter International Corp.

B. Allston Moore, Jr., Buist, Moore, Smythe & McGee, Charleston, S. C., for Small World Creative Enterprises, Inc.

J. Rutledge Young, Jr., Young, Clement, Rivers & Tisdale, Charleston, S. C., for Roy W. Sweeney.

## ORDER

HAWKINS, District Judge.

This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. On the afternoon of Sunday, May 8, 1977, June Catherine Sweeney was a passenger in a fourteen and one-half foot outboard motor boat owned and operated by her husband, Roy W. Sweeney. At a point on the Atlantic Intracoastal Waterway between Mt. Pleasant and Sullivan's Island, South Carolina, just to the north of the Ben Sawyer Bridge, Mrs. Sweeney sustained certain injuries to her back when her small boat was allegedly tossed about by the wakes of two passing yachts, causing her to be thrown heavily to the deck.

In due course, Mrs. Sweeney commenced an action in admiralty against Car/Puter International Corporation (hereinafter "Car/Puter"), the corporate owner of a forty-five foot Hatteras yacht, and Small World Creative Enterprises, Inc. (hereinafter "Small World"), the corporate owner of a seventy-two foot Burger yacht, alleging that the two vessels were so negligently and recklessly operated that they jointly and concurrently brought about the conditions which caused her to be severely and permanently injured. Small World answered the plaintiff's complaint with a general denial, a plea of contributory negligence on the part of the plaintiff, and a further plea that her damages resulted wholly from the negligence and recklessness of her husband in the operation of the boat. In addition, it impleaded Roy W. Sweeney as a third-party defendant, alleging that the plaintiff's injuries were due wholly to his fault in the handling of the small boat and demanding that he held liable for his wife's damages, either in whole or in proportion to his fault. Car/Puter filed essentially the same answer and subsequently joined with Small World in impleading Mr. Sweeney.

In his answer to the third-party complaint, Mr. Sweeney denied any responsibility for his wife's injuries and asserted counterclaims against the two third-party plaintiffs for his own damages consisting of the loss of his wife's society, companionship and services. The cross-complaint alleged further that the cross claimant's wife was forced to visit medical specialists and hospitals to receive treatment, medicine, appliances and advice. The third-party plaintiffs have moved to dismiss the husband's loss of consortium action as not recognizable in admiralty, and the court reserved a decision on the motion until the testimony had been taken.

With the issues thus joined, the case was tried before me in Charleston, South Carolina, on April 21, 22, 23 and 24, 1980. A number of witnesses testified in person. There was deposition testimony from the Master of the yacht SMALL WORLD and from a doctor now deceased, and there were entered into evidence numerous photographs, charts, plats and other documents. I have been furnished with Proposed Findings of Fact and Conclusions of Law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. On May 8, 1977, the plaintiff, June Catherine Sweeney, was thirty-nine years old, employed as an accounting clerk with Slater Corporation at The Citadel, the military college of South Carolina, in Charleston. She was married to Roy W. Sweeney and the mother of two children, Susan, sixteen years of age, and Robert, fourteen years of age.

2. On May 8, 1977, the third-party defendant and cross claimant, Roy W. Sweeney, was forty-eight years of age and was employed as a butcher at a Piggly Wiggly store in North Charleston, South Carolina.

He had been a boatswain's striker in the U. S. Navy for five years; he had owned several small boats from which he fished and his son waterskied, and the family occasionally went on boating trips together.

3. Sometime around the latter part of April 1977, Roy W. Sweeney purchased a fourteen and one-half foot Correct Craft pleasure boat equipped with a forty horsepower outboard motor. The boat is an open fiberglass tri-hull boat with one swivel seat in the bow on a pedestal which in turn is on a platform slightly raised above the bottom of the boat. There are two swivel seats in the afterend of the boat just forward of the motor where the operator and one passenger sit. The steering wheel and controls are on the starboard side between midship and the starboard aft swivel seat. About midship there are located two dry-storage lockers, one on each side of the boat, which are equipped with cushions. Two persons can be seated on these lockers facing each other; however, the lockers are relatively high in relation to the gunwale of the boat and are higher than the platform in the bow. The only rails on the boat are located around the bow and alongside the aft seats.

4. On Sunday, May 8, 1977, Mother's Day, the Sweeney family decided to go on a family outing in the boat. They trailered the boat to a landing on the intracoastal waterway just south of the Ben Sawyer Bridge, which is a swing bridge spanning the intracoastal waterway between Mt. Pleasant, S. C., and Sullivan's Island, S. C. They launched the boat and proceeded north up the intracoastal waterway under the Ben Sawyer Bridge to Breach Inlet at the northern end of Sullivan's Island. Robert Sweeney, the son, skied in the inlet for 20 minutes or so, and then the family decided to return home and cook out.

5. The SHALIDON is a Hatteras Sport Fisherman owned by the defendant, Car/Puter International Corporation, a New York corporation. It is forty-five feet long and has a width of fourteen feet, two inches. The gross tonnage is thirty-four tons, and it is equipped with two 335 horsepower inboard diesel engines. It is painted white with blue stripes and has what is commonly called a "tuna tower", which is a tall steel structure extending above the cabin. Immediately beneath the "tuna tower" is the "flying bridge" from which the vessel can be controlled. On May 8, 1977, this boat was being operated by a twenty-five year old professional boat captain, Barry A. Ratliff, and his brother, Keith, who was the mate. The captain was in the process of delivering the SHALIDON from Miami, Florida, to New York. On the previous day, May 7, 1977, he had brought the boat via the Atlantic Ocean from Jacksonville, Florida, to Charleston, South Carolina. On May 8th, he had attempted to take the boat "outside" again, but the seas were running so high he was forced to turn around, come back into Charleston Harbor, and proceed up the intracoastal waterway. As a result of his entering the Atlantic Ocean and having to return to Charleston Harbor he was some five hours behind his schedule.

6. The motor yacht SMALL WORLD was designed and built by the Burger Boat Company, Inc. of Manitowoc, Wisconsin, for the defendant, Small World Creative Enterprises, Inc., a Delaware corporation. It is seventy-two feet, two inches in length overall; has a beam of eighteen feet, four inches, a gross tonnage of eighty-eight tons, and is powered by two 450 horsepower inboard diesel engines. The hull is painted white with a blue stripe. The vessel can be controlled from the main cabin or from a sundeck, or bridge, located above the main cabin. On May 8, 1977, the SMALL WORLD had a crew of three; fifty-two year old Captain Stuart Ames, a licensed professional captain, the mate, Chris Bolger, and the cook, Dan Conlon. The SMALL WORLD left Palm Beach, Florida, on the morning of May 4, 1977, with the beneficial owners, Mr. and Mrs. Mac Schwebel, also on board and with a destination of Stanford, Connecticut. It left Beaufort, South Carolina, at 6:00 A.M. on Sunday, May 8th, and arrived Charleston at 11:45 A.M.

7. The weather was sunny, with a moderate wind, water somewhat choppy, vision

clear and unobstructed, and a high tide about 1:00 P.M. EDT. Testimony as to the direction of the wind is in conflict. According to the official marine weather forecasts for May 8, 1977, and the actual marine coastal weather log and Charleston surface weather observations on that day, entered as exhibits at trial, no small craft warnings were in effect at any time on May 8, 1977.

8. The Ben Sawyer Memorial Bridge is a swing bridge, which means that the span pivots on a center section thus allowing vessels to pass through a draw. It is tended by a bridge tender who operates the mechanism that swings the bridge and maintains a "Draw Bridge Report" of vessels necessitating the opening of the bridge. It is shown on National Oceanic and Atmospheric Administration Nautical Chart No. 11518, S. C. Intracoastal Waterway. A segment of the chart portrays the stretch from the south end of Sullivan's Island to a point several miles north of the Ben Sawyer Bridge. According to the chart and the testimony at trial, the waterway just north of the Ben Sawyer Bridge is generally straight and measure 300 feet to 400 feet from bank to bank. On May 8, 1977, the depth of the waterway was nine feet at mean low tide. The navigable channel is about 150 feet wide. During the month of May, high tide would cause the depth of the waterway to be between fourteen feet and fifteen feet.

9. The bridge tender logged on the "Draw Bridge Report" that on May 8, 1977, the bridge opened at 12:20 P.M. EDT and that the yacht, SMALL WORLD, and a Sport Fisherman, SHELDON, passed through. The bridge was closed at 12:27 P.M. The bridge tender logged at 12:42 P.M. EDT that the Sport Fisherman, LEONA, and the Sport Fisherman, SUMMER WIND, passed through. The bridge was closed at 12:48 P.M. The bridge tender's report further shows that the only other vessels requiring the bridge to open between 11:00 A.M. and 3:15 P.M. on May 8, 1977, were sailboats. It is the opinion of this court that the bridge tender erred in noting the name SHELDON instead of the name SHALIDON in his log, and the court specifically finds that the SMALL WORLD and the SHALIDON passed through the bridge together. The captain of the SMALL WORLD and Mr. Schwebel testified that they did not recall the SHALIDON following them, which indicates that they were not keeping a proper lookout. Captain Ratliff of the SHALIDON testified that he had no recollection of passing through the Ben Sawyer Bridge, but that somewhere north of the bridge he recalled passing the SMALL WORLD. Neither the captain of the SMALL WORLD, Mr. Schwebel, nor the captain of the SHALIDON remembered seeing the Sweeney boat.

10. Roy W. Sweeney and his family, travelling in a southerly direction, were 300 or 400 yards north of the Ben Sawyer Bridge when he observed the SMALL WORLD and the SHALIDON passing through the bridge.

11. In his testimony, Roy Sweeney described the SMALL WORLD as a boat that "looked like an ocean liner", sixty feet or seventy feet long and painted white. He described the SHALIDON as a Sport Fisherman with a person on the "flying bridge". He testified that the first boat had its back down and bow up and was picking up speed. He estimated the wakes from the two boats to be three feet to four feet in height, but they were travelling so close together that the wakes of the SHALIDON were indistinguishable from the SMALL WORLD'S wakes.

12. Upon observing the huge wakes from the two larger boats, Roy Sweeney steered his boat toward the westernmost bank of the intracoastal waterway, attempting to avoid the wakes and where the shallower depths of the water would be safer in the event the boat capsized. He slowed to a speed of approximately five to seven miles per hour and turned the bow of his boat into the approaching wakes. Prior to crossing the wakes, he instructed his wife and daughter, who were seated on the dry storage lockers, to place themselves on their boat cushions in the bow of the boat and to hold onto the bow rail and seat pedestal to

prevent themselves from being carried overboard in the event the wakes washed over the boat. Roy Sweeney and his son remained in the seats located in the stern of the boat. As the Sweeney boat crossed the wakes, it was tossed about violently, causing the plaintiff, June Catherine Sweeney, to be thrown about the boat, thereby sustaining serious injury. The testimony is in conflict as to whether the SMALL WORLD was being operated from the sundeck. The captain and beneficial owners of the SMALL WORLD testified that they were on the sundeck; however, the captain of the SHALIDON testified that he did not recall seeing anyone on the sundeck, and the members of the Sweeney family also testified that they did not remember seeing anyone on the sundeck. There was testimony that a man on the flying bridge of the SHALIDON looked back several times at the imperiled Sweeney boat. Neither the SMALL WORLD nor the SHALIDON slowed or made any visible effort to render assistance to the passengers in the Sweeney boat.

13. The court finds that the manner in which the SMALL WORLD and the SHALIDON were being operated constituted negligent conduct on the part of the defendants, Car/Puter and Small World, and was a proximate cause of the injuries to the plaintiff, June Catherine Sweeney. The defendants, Car/Puter and Small World, did not use reasonable care in operating their boats at such a speed or otherwise maintaining a lookout so as to prevent injuries from the wakes emanating from the two vessels. Both large yachts violated the Inland Rules of the Road in failing to properly reduce their speed and keep their wakes low in an area in which large wakes obviously would cause damage to person and property. Additionally, the operators of the two large yachts were in a superior position to discover the peril of the Sweeneys and to avoid the accident, but by their failure to keep a proper lookout, they failed to see what they should have, thereby rendering them both negligent. Mr. Sweeney operated his boat in a reasonable and prudent manner and his conduct played no role

in causing the injuries to Mrs. Sweeney. Mrs. Sweeney, as a passenger in her husband's boat, likewise conducted herself in a reasonable and prudent manner and is not chargeable with any negligence or fault which contributed to the cause of her injuries.

14. In apportioning liability between the defendants, Car/Puter and Small World, the court has determined each to be fifty (50%) per cent at fault.

15. As a result of the injuries that Mrs. Sweeney received on May 8, 1977, she was hospitalized where she was diagnosed as having a fracture of the twelfth thoracic vertebra (hereinafter "T–12"). She remained hospitalized at Roper Hospital in Charleston, South Carolina, from May 9, 1977, through May 28, 1977. During much of that hospitalization, she was restricted to complete bed rest with instructions to remain immobile. Toward the end of her hospitalization, a brace was applied so that the healing process could continue. Dr. B. L. Freeman, orthopaedist, consulted Mrs. Sweeney in the hospital and continued to treat her by way of follow-up care subsequent to discharge. Mrs. Sweeney took prescribed pain medication during hospitalization and for long periods of time thereafter. Although she still takes prescribed pain medication infrequently, she continues to take non-prescription pain relievers regularly. Dr. Freeman saw Mrs. Sweeney on December 5, 1977, and noted that the compression fracture had completely healed but that there was a residual of a fifty (50%) per cent compression of the vertebral body in question which was permanent in nature. He further stated that as Mrs. Sweeney grows older she is more apt to develop arthritic changes in the area of the injury. Dr. Freeman saw Mrs. Sweeney again on February 14, 1979, and was advised by way of history that she continued to have pain in her back and was unable to do much housework. She was unable to engage in sexual intercourse with her husband because of the pain in her back. She was at this time wearing a canvas corset in an attempt to alleviate the pain. Dr. Free-

man's examination showed restriction of forward motion of Mrs. Sweeney's spine and also hyperesthesia on both sides of the abdomen about the sensory distribution of the twelfth dermatone. Dr. Freeman testified that if Mrs. Sweeney was continuing to experience pain in the area of her back injury at this point in time, which was approximately three years subsequent to the injury, he would expect the pain to continue indefinitely. When questioned, Dr. Freeman opined that Mrs. Sweeney had sustained, as a result of the injury on May 8, 1977, an estimated nineteen (19) to twenty (20) per cent impairment of the spine.

16. Mrs. Sweeney consulted Luther Martin, M.D., neurological surgeon, in May 1978, regarding the symptoms which were present as a result of the injury on May 8, 1977. By way of history, Mrs. Sweeney described to Dr. Martin pain across her back above the belt line and that she had difficulty sitting for any length of time or walking upstairs or doing any type of housework. She again advised of the pain caused by any sexual relations with her husband. She advised that she had used a board under her mattress for sleeping, but she still remained quite stiff and painful and had difficulty getting up in the mornings. She had continued to wear a back support and to take muscle relaxing medication. On physical examination there was moderate tenderness over the posterior cervical muscles. There was also localized tenderness over both occipital nerves. Examination evidenced discomfort in ranges of motion of the cervical spine in extension, flexion, and lateral bending. There was marked tenderness over the lower thoracic spine and tenderness both in the mid-line and in the paraspinal muscles. There was restricted motion in the thoracic spine in extension, flexion and lateral bending. There was a zone of hyperesthesia to pin prick beginning in the mid-line posteriorly and extending out from both sides about the area of T–12. The zone of hyperesthesia was about two and one-half inches wide and extended obliquely down and around the lateral abdominal wall.

Dr. Martin concluded that Mrs. Sweeney sustained injuries to both the bony and soft tissues in her lower back, lower thoracic area and in the cervical spine. He opined that Mrs. Sweeney would continue to have pain in the area of the fracture and had evidence of irritation and damage to the T–12 nerve roots. He further noted that Mrs. Sweeney's intermittent headaches were related to the sporadic tightening of the muscles in the back and the cervical spine causing some irritation of the occipital nerves. Considering the Guides to The Evaluation of Permanent Impairment which is published by the American Medical Association, Dr. Martin opined that the fifty (50%) per cent compression fracture of T–12, along with the added evidence of nerve root damage and muscular and soft tissue damage, would result in Mrs. Sweeney having about a twenty (20%) per cent permanent impairment of the body as a result of the spinal injury sustained on May 8, 1977. He stated that Mrs. Sweeney would have to remain relatively inactive and would not be able to return to her previous employment. He further indicated that pain medication and muscle relaxers may be required intermittently and that Mrs. Sweeney would have to continue use of the back support, particularly when the back pain was more severe. Dr. Martin did not rule out the possibility of a nerve block or re-section of the T–12 nerve roots.

O. Rhett Talbert, M.D., a neurologist, saw Mrs. Sweeney for evaluation on March 31, 1980. He testified that his physical examination revealed an increase in the lumbar lordosis, a prominence of the T–12 vertebra, and a limitation of trunk flexion to forty-five (45) degrees. Dr. Talbert concluded that Mrs. Sweeney had suffered a concussion of the spinal cord on May 8, 1977. He further stated that Mrs. Sweeney was presently experiencing residual physical impairment due to pain and would continue to have limitation of motion. Dr. Talbert expressed pessimism regarding Mrs. Sweeney's prognosis based on the "good deal of trouble" she was experiencing approximately three years after the injury. None of the physicians who testified felt that Mrs.

Sweeney was being untruthful when relating complaints or that she was in any way malingering or exaggerating her injuries.

17. At the time of her injury, the plaintiff was employed full time. She has not worked at all since her injury and, since her symptoms have now stabilized, it is apparent that she will continue to be disabled as far as obtaining gainful employment. She was required to do stooping, bending and other general office clerical duties at her job. She has testified that due to the pain associated with the back injury, she is not able to perform these tasks and has to lie down for rest and relief of pain numerous times throughout the day. There is every reason to believe that the plaintiff's future earning capacity has been destroyed. Oliver Wood, Ph.D., an actuarial expert, has opined that Mrs. Sweeney will suffer a loss of income of $179,422.00, which includes the period from the date of the injury until the trial, as well as the future loss of income, reduced to its present day value, at an interest rate of five (5%) per cent. The above figure includes earning capacity and meals, which was an employee benefit.

18. The following special damages were suffered:

| | |
|---|---|
| Roper Hospital | $1,390.00 |
| B. L. Freeman, M.D. | 354.00 |
| J. S. Howell, M.D. | 284.00 |
| Luther Martin, M.D. | 150.00 |
| Floyd Brace Shop (2 braces) | 187.20 |
| Pathology Associates | 14.50 |
| Medication | 70.46 |
| TOTAL | $2,450.16 |

19. Mrs. Sweeney was born October 10, 1937, and was 39.57 years old at the time of the injury. Pursuant to Section 19–1–150, South Carolina Code of Laws (1976), her life expectancy was an additional 32.18 years. However, Dr. Wood has used a work-life expectancy in making his calculations, assuming Mrs. Sweeney would work to age sixty.

20. Another element of loss as a result of the injuries she received on May 8, 1977, is an inability of plaintiff to perform certain family services that in the past she performed. She testified in detail that she is not able to do any of the heavy housework and not even able to do light housework on an extended basis. Most of the housework heretofore provided by Mrs. Sweeney has been relegated to her children and her husband. Prior to her injury, Mrs. Sweeney also did substantial yard work in maintaining the residence where she and her family live. This included raking, weeding, and other yard work which required bending, stooping and lifting. She is not able to perform any of these tasks. The pretrial and post trial value of these services have been calculated by Dr. Wood, and I find that Mrs. Sweeney is entitled to $90,000.00 for loss of family services. The post trial portion of this loss has also been reduced to its present day value.

21. Thomas H. House, Ph.D., a clinical psychologist, examined Mrs. Sweeney for 12.5 hours and also talked with her family, and he has expressed the opinion that there are permanent emotional scars from the events which give rise to this suit. Mrs. Sweeney, previously an active and competent woman, has become extremely depressed and has lost the motivation and ability to cope with the changes in her life which have resulted from the injury on May 8, 1977. She is unable to adjust to the present situation and thus feels helpless and out of control. Seeing no potential for improvement in her condition, she has succumbed to feeling old and useless. In the past she was the primary initiator and maintainer of the family's activities, from which they derived most of their intercommunication. Now she is not only unable to fulfill this function, but feels that she is a bad influence on the children and is burdening them and her husband with her housework. She sees her family as unhappy and considers herself the blame for this. The change in body image with concomitant limitation resulted in a markedly lower self-concept, depression, guilt, low energy and motivation, and an increase in ruminative and somewhat unusual thinking. She can no longer live up to the role expectations for herself and is experiencing great difficulty in adjusting to this change. Dr. House's prognosis for Mrs. Sweeney is that

she is using neurotic tendencies to control her anxieties and minimize her feelings of distress. Heavily oriented toward family participation, she daily loses ground as her children become older and move toward age-expected independence. She will continue to feel increasingly isolated and out of the previously heavy family support. Being a sensitive individual, Mrs. Sweeney will in turn perceive her husband's irritation with her and will withdraw even more. A woman of average intelligence, heavily dependent in the past on social-physical activities, which have now been curtailed, she lacks cognitive ability in range of past experience to permit her to adopt reasonable, satisfying alternatives. The prognosis for her to regain the lost relationship with her husband and the previous interactions with her children is very poor. Dr. House has recommended both individual and family therapy for the Sweeneys. He estimated that the cost could range from $40 to $100 per hour and that the Sweeneys should be seen weekly for an absolute minimum of two years.

Dr. House is also a Vocational Rehabilitation expert as defined by the Department of Health, Education and Welfare, now the Department of Health and Human Services. In that capacity, he testified that Mrs. Sweeney evidenced impaired concentration and focus ability. He concluded that with her degree of psychological impairment, combined with her physical limitations, he did not know of any employer that would hire her.

22. I also find that Mrs. Sweeney has suffered substantial past and future pain and suffering and mental anguish. This is supported by the testimony of her family and of the lay witnesses, the medical experts and the expert opinion given by Dr. House.

23. I further find that Mrs. Sweeney has suffered a loss of recreation and a general loss of enjoyment of life. The testimony showed that prior to the injury, she was very active and interacted with her family in various recreational endeavors. She went boating, bicycling, dancing, and enjoyed other hobbies, all of which she is unable to perform as a result of the injuries received on May 8, 1977.

24. It is just as obvious from the testimony that Roy Sweeney, plaintiff's husband, has suffered a loss of comfort and society and general enjoyment of his wife. Dr. House testified that the marital and sexual relationship between Mr. and Mrs. Sweeney has been damaged. The sexual activity has greatly declined and is not satisfactory to either partner. Mr. Sweeney, while very concerned about his wife, has historically depended on her and, although he rationally recognizes that he can no longer do this, at the same time he feels, and will continue to feel, resentment. Being a sensitive individual, Mrs. Sweeney will in return perceive his irritation and will withdraw even more. Mrs. Sweeney's marriage and its relatively smooth course had been of primary importance to her prior to her injury. She had expended a disproportionately large effort on a consistent basis throughout the years, in keeping with the traditional viewpoint of partners. With her pain, depression, and preoccupation since the injury, Mrs. Sweeney has had less energy and motivation. Therefore, she has not attended social occasions with her husband, as before, and does not participate in their other mutual interests, such as sports. This present situation violates her role expectation of a good wife and brings her more guilt and depression. Their marital adjustment is also negatively affected. The former feelings of contentment with the relationship and with each other no longer exists. They feel their entire relationship has been changed. Mr. Sweeney, a reserved man accustomed to his wife carrying the greater load of their marriage, is distressed and dissatisfied with their present situation.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action. The plaintiff's personal injuries, occurring on the navigable waters of the United States, has the proper maritime nexus. *Whittington v. Sewer Construction Co., Inc.*, 541 F.2d 427 (4th Cir. 1976).

2. Negligent operation of a vessel which causes a wake which does injury or damage to a person or property can be the basis for imposition of liability. In *Moran v. The M/V Georgie May*, 164 F.Supp. 881 (S.D.Fla.1958), plaintiff was a passenger in a small, fourteen foot motorboat proceeding in a southerly direction on the Intracoastal Waterway near Fort Lauderdale, Florida. The respondent vessel was a forty-three foot sport fishing boat travelling at approximately fifteen to sixteen miles per hour as it passed the smaller craft at a distance of approximately thirty-five feet. The speed of the larger vessel created at least two swells of three to five feet. Although the operator of the craft on which plaintiff was a passenger took action to avoid the swells, plaintiff was thrown out of his seat and suffered a fracture at the first lumbar vertebra. *Id.* at 883–84.

The court rendered judgment for plaintiff. The following conclusions of law in *Moran* are relevant to the instant case:

A vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion through the water at the particular place and under the particular circumstances where the injury occurred, and her officers are required to take into consideration others who may reasonably be expected to be affected, and to take all reasonable precautions to avoid their injury even though former experience has shown that in the ordinary and usual course of events they are likely to escape injury or that the larger vessel was proceeding on ordinary course and at her customary speed. Smaller craft have the right to assume larger craft aware of their presence will observe reasonable precautions and are under no duty to warn the larger vessel of the danger . . . .

. . . .

The Georgie May and those in charge of her were negligent in view of the relative size of the vessels, the size of the swells or waves created by the Georgie May in meeting and passing the boat occupied by Libellant at a critical speed at which she generated maximum swells or waves, and by proceeding unnecessarily close to the boat in which Libellant was a passenger, while maintaining a course in the center of the channel instead of staying to her port side of the channel during the adopted starboard passage.

*Id.* at 884–85 (citations omitted).

A similar holding is found as dictum in *Anthony v. International Paper Co.*, 289 F.2d 574 (4th Cir. 1961), which was essentially a wrongful death action brought under South Carolina law, there being no wrongful death remedy under the general maritime law at the time. There, a fourteen foot motorboat capsized after being upset by a wake from a seventy foot tug travelling in the opposite direction. While the principal issue before the court was the efficacy of a jury instruction regarding proper lookout, it made the following comment appropriate to this case:

The navigation of such craft [small boats] is necessarily affected by the wake or swell caused by the passage of larger vessels and the cases hold that a duty is imposed upon them to exercise due care for the safety of the smaller boats traversing the inland waters.

*Id.* at 579. The cases relied on by the court, *West India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673 (5th Cir. 1951), and *United States v. Ladd*, 193 F.2d 929 (4th Cir. 1952), were property damage cases but, as noted in *Moran*, 164 F.Supp. at 885, this is of no moment as personal injury is no less foreseeable than is property damage. *Accord, Couch v. Bowman*, 263 F.Supp. 714 (E.D. Tenn.1966) (plaintiff standing on or near his boat dock; defendant operating his motorboat at excessive speed causing swell or wave; plaintiff struck by wave or by his boat which was knocked loose from dock; judgment for plaintiff).

Although it is apparent that the boats owned by the defendants, Car/Puter and Small World, were negligently operated, it has been held that a *prima facie* case is established by proof of injury caused by a

swell from a passing vessel. *See, West India Fruit*, 190 F.2d at 614.

■ 3. In regard to the respective liability of the two defendants, Car/Puter and Small World, the rule in admiralty is, at least in collision cases, where more than one party is responsible for the accident, "liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault...." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). This doctrine has subsequently been applied in noncollision cases as well. *See Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1249 (5th Cir. 1979); *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31, 44 (3d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).

The case that for present purposes would be most on point with regard to multiple defendants is *Miller Industries, Inc. v. Caterpillar Tractor Co.*, 473 F.Supp. 1147 (S.D. Ala.1979). This was an admiralty action brought on various theories of products liability against the manufacturer and distributor of a defective boat engine. After finding that admiralty had jurisdiction over the claim, the court held:

> In an admiralty case where the negligence of one or more defendants concurs to cause damage to the plaintiff, the court may apportion the liability to the negligent defendants in accordance with the comparative degree of their fault
> ....

*Miller*, 473 F.Supp. at 1155 (citations omitted). The court found the distributor to be sixty (60%) per cent at fault and the manufacturer forty (40%) per cent at fault and that "the parties are liable in this proportion *for such damages to the plaintiffs* which resulted from their combined negligence." *Id.* This court has determined that the respective vessels being operated by the defendants, Car/Puter and Small World, were equally at fault and thus both are fifty (50%) per cent responsible for the injuries caused to Mr. and Mrs. Sweeney.

■ 4. Although in the court's opinion it is not necessary for the plaintiff, under the facts of the case at bar, to rely upon the doctrine of *res ipsa loquitur* in order to prove her case, the doctrine does lend support to responsibility of the defendants, Car/Puter and Small World. In order to invoke the doctrine, the plaintiff must prove, as she has done: (1) freedom from fault on her part; (2) that the act or instrumentality causing injury was in the defendants' exclusive control, and (3) that the evidence of the injury gives rise to a presumption of negligence. *See generally* Annot., "Injury on Ship-Res Ipsa Loquitur," 1 A.L.R.3d 642, 645 (1965). In *Goodwin v. United States*, 141 F.Supp. 445 (E.D.N.C. 1956), the plaintiff sustained personal injuries when his fishing vessel was struck by a practice bomb from a Marine Corps plane which fell six miles off target. In entering judgment for the plaintiff, the court said:

> ... the fact itself under the doctrine of *res ipsa loquitur*, is sufficient to support a finding of negligence and in the absence of evidence as to the circumstances surrounding the occurrence leads inevitably to such conclusion.

*Id.* at 446.

In *The Havana*, 100 F. 857 (E.D.N.Y. 1900), libellant's vessel, the Murcia, was sprung from her mooring by waves generated by the passing Havana. Although there was evidence that ships larger than the Havana and travelling faster had passed the Murcia without incident, the court said it was conjectural as to why this should have been and the facts "indicate abnormal results from navigating the river, from which negligence ... may be inferred." *Id.* at 858–59. Similarly, in *West India Fruit*, 190 F.2d at 674, under facts similar to those in *The Havana*, the court held that "the fact of injury ... from swells *prima facie* establishes the liability of the Parrot." These cases can be construed as implicitly recognizing the doctrine of *res ipsa loquitur* in "swell" cases.

■ 5. In South Carolina various decisions give guidance to the consideration of damages to be awarded. "Actual damages are when the wrongful act has caused a loss

or injury which can be assessed in money, the universal and cardinal principle being that the person injured shall receive compensation commensurate with his loss or injury, and no more." *Hutchison v. Town of Summerville*, 66 S.C. 442, 45 S.E. 8 (1903). The injured party should recover damages proportionate to the injuries sustained. *Drennan v. Southern Railway*, 91 S.C. 507, 75 S.E. 45 (1912). The injured may recover an amount sufficient to compensate him for his injuries. *Johnson v. Atlantic Coast Line Railroad*, 142 S.C. 125, 140 S.E. 443 (1927); *see also Kapuschinsky v. United States*, 259 F.Supp. 1 (D.S.C.1966).

■ 6. The elements of damage which can properly be considered in determining the amount a personal injury plaintiff may be entitled to recover include plaintiff's loss of earning power, pain and suffering, medical expenses, and any future damages resulting from permanent injuries. *Watson v. Wilkinson Trucking Co.*, 244 S.C. 217, 136 S.E.2d 286, 291 (1964); *Oliver v. Blakeney*, 244 S.C. 565, 137 S.E.2d 772, 776 (1964). The testimony reveals that those elements are existing in this case. The court realizes that there is no yardstick by which pain and suffering, psychological damage and impairment of earning capacity can be precisely measured in dollars and cents. The court is further mindful that mathematical precision in fixing damages is not demanded. *Brooks v. United States*, 273 F.Supp. 619, 629 (D.S.C.1967).

■ 7. Considering damages suffered by the plaintiff, it is quite clear that impairment to future earning capacity is a necessary and proper element of damages. *Steeves v. United States*, 294 F.Supp. 446, 456 (D.S.C.1968); *Brooks*, 273 F.Supp. at 626; *Matthews v. Porter*, 239 S.C. 620, 124 S.E.2d 321, 328 (1962). In short, it is the probable duration of the plaintiff's earning capacity, her "work expectancy", over which the estimate of her prospective annual earnings must be spread. *Brooks* at 628. It is further settled that these prospective earnings must be reduced to present value. *Brooks* at 633. Again, the court had the benefit of detailed testimony of Dr. Wood

regarding this element of damages, and the court finds that the plaintiff is entitled to $179,422.00, which includes pretrial lost wages as well as post trial lost wages which have been reduced to present value.

■ 8. The evidence adduced adequately supports an award of damages for the plaintiff's loss of family services which she heretofore provided to her family. She has lost the ability to provide twenty-four hours per week, and the court is mindful that these family services would not cease at her work life expectancy, but would probably be continued during her normal life expectancy, which from the date of trial is thirty years. Although it is unnecessary to have precise mathematical proof as to this element of damage, the court again had the advantage of the testimony of Dr. Wood, actuarial expert, who testified in detail regarding loss of family services. The court finds an award of $90,000.00, which is a combination of pretrial family services loss and future family services loss which have been reduced to present value.

■ 9. The plaintiff was forty-two years of age at the time of trial and the evidence supports a finding that she has and will continue to endure pain and suffering for the remainder of her life expectancy. Based upon the factual situation and the evidence adduced at trial, the court finds that the plaintiff is entitled to an award of $15,000.00 for pain and suffering from the date of the injury to the date of trial. The court further finds that she is entitled to $76,862.00 for future pain and suffering. The damages for future pain and suffering were computed by awarding the plaintiff $5,000.00 per year for her life expectancy of thirty years, or a total of $150,000.00, and reducing this amount to its present cash value by the use of a discount rate of five (5%) per cent, which is the discount rate this court feels is reasonable and fair. The court notes that this discount rate and the method of computing value for future pain and suffering have heretofore been considered reasonable by United States District Judge Sol Blatt, Jr. *See Doyle v. United States*, 441 F.Supp. 701

(D.S.C., 1977). The total value assessed by the court for pretrial and post trial pain and suffering is $91,862.00.

 10. The court is aware that pain and suffering also includes mental anguish and permanent emotional scarring, which is a substantial element in the case at bar. *Steeves*, 294 F.Supp. at 458; *Baldowski v. United States*, 111 F.Supp. 653, 656 (D.S.C. 1953); *Bussey v. Charleston & W.C. Railway*, 52 S.C. 438, 30 S.E. 477, 481 (1898). I am of the opinion that the psychological and emotional damages are substantial and that an amount to be awarded for these injuries should be separately considered. This element of injury is at least equal to the value assessed to the pain and suffering aspect of the plaintiff's claim. Therefore, using the same method of calculation, the court finds that the plaintiff is entitled to $91,862.00 for psychological and emotional damages.

 11. The court is also mindful that the plaintiff has lost the ability to enjoy the normal activities of life that she heretofore enjoyed, such as recreational endeavors, and believes that it is proper to award a sufficient amount for that. In *Steeves*, Judge Hemphill made a separate allocation for loss of recreation. *See Steeves*, 294 F.Supp. at 458. The court believes that it is reasonable to use the same method of calculating the loss of recreation and ability to enjoy life as was used for past and future pain and suffering and psychological damages, and hereby awards an amount of $55,117.00 for that element of injury. This amount includes an award of $9,000.00 for the pretrial portion and an award of $3,000.00 per year for the post trial portion, reduced to present day value.

 12. The third-party defendant, Roy W. Sweeney, has initiated a cross claim against the defendants, Car/Puter and Small World, for loss of consortium as a result of the injuries caused to his wife, June Catherine Sweeney. Although the Fourth Circuit Court of Appeals has not ruled upon the issue of whether or not loss of consortium is recognizable in admiralty litigation, it is this court's opinion that the rational approach is to recognize such a claim. In the case of *Lemon v. Bank Lines, Ltd.*, 411 F.Supp. 677 (S.D.Ga.1976), aff'd, 562 F.2d 1259 (5th Cir. 1977), the court held, on overruling previous decisions, that loss of consortium should be allowed. *Lemon* involved an action by the wife of an injured longshoreman for loss of consortium caused by the negligence of a shipowner. The court found that, under Georgia law, a wife has an independent cause of action for loss of consortium of her husband due to tortious injury, but since the plaintiff's husband was injured on navigable waters, the basis of her action is a maritime tort which is governed by federal maritime law. The court discussed several federal cases which had held that loss of consortium is not an element of damages in federal maritime law. *See Igneri v. Transport Oceaniques*, 323 F.2d 257 (2d Cir. 1963); *Valitutto v. D/S I/D Garrone*, 295 F.Supp. 764 (S.D.N.Y.1969); *Sanserverina v. Alcoa Steamship Co.*, 276 F.Supp. 894 (D.Md.1967). The court then discussed new trends:

> In 1970 a fresh breeze suddenly blew in across the waters of American admiralty law. In *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the Supreme Court held that a right of action for wrongful death exists under general maritime law for the death of a longshoreman within state territorial waters.... That case was followed in 1974 by *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

> Under the judge-made death remedy created by *Moragne*, the Supreme Court rules in *Gaudet* that there could be recovery for non-pecuniary losses, including deprivation of the society, affection, care, attention, companionship, comfort and protection of the deceased—in short, for loss of consortium.

> ... I am unable to see the rationality of a rule that if a defendant's negligence causes death, consortium can be recovered by the widow, but where only injury results, a wife cannot. I perceive no difference in the nature of suits justifying so bizarre and inconsistent a result. A

wife may be damaged as much as a widow by the loss of her husband's society, affection, companionship and sexual congress.

. . . (A) California intermediate appellate court has lately passed directly on the issue. It reached the same conclusion toward which, as may be gathered, I was irremeably headed. The case is *Pesce v. Sama Corp.,* 54 Cal.App.3d 86, 126 Cal. Rptr. 451 (Cal.App.2d App.Dist. No. 46317, Dec. 20, 1975). Reversing the trial court's dismissal of the wife's action, the California appellate court held that the spouse of an injured longshoreman may recover under the general maritime law for loss of consortium of her husband caused by the negligence of the shipowner. I agree.

*Lemon,* 411 F.Supp. at 679–680. This court acquiesces and agrees with the above reasoning.

The United States Supreme Court, in *American Export Lines, Inc. v. Alvez,* 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980), has put this matter to rest. The Court, after discussing *Gaudet* and *Igneri,* reached the conclusion that general maritime law authorized the wife of a harborworker injured non-fatally aboard a vessel in state territorial waters to maintain an action for damages for the loss of her husband's society. This court is of the opinion that the *Alvez* case controls under the circumstances of the cross claim at bar and that Mr. Sweeney, the third-party defendant and cross claimant, has a claim for loss of consortium. Thus, the third-party plaintiffs' motion to dismiss the loss of consortium claim should be denied.

13. It is apparent from the testimony that Mr. Sweeney has suffered a substantial loss as a result of the injuries to his wife, and I find that an amount of $125,-000.00 should be awarded to him.

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered:

ORDERED, that judgment be entered on behalf of the plaintiff, June Catherine Sweeney, as follows:

| | |
|---|---:|
| A. Loss of earning capacity (including pretrial loss and post trial loss with reduction to present day value) (Also includes fringe benefits from employment) | $179,422.00 |
| B. Loss of family and personal services (includes pretrial and post trial loss reduced to present day value) | $ 90,000.00 |
| C. Pain and suffering (includes past amounts as well as future amounts reduced to present day value) | $ 91,862.00 |
| D. Psychological and emotional injuries (includes past amounts as well as future amounts reduced to present day value) | $ 91,862.00 |
| E. Loss of enjoyment of life and recreation, etc. (includes past amounts as well as future amounts reduced to present day value) | $ 55,117.00 |
| F. Medical Expenses | $ 2,450.16 |
| TOTAL . . . . . . . . . . | $510,713.16 |

ORDERED FURTHER, that the motion by the third-party plaintiffs to dismiss the claim for loss of consortium by Mr. Sweeney, the third-party defendant and cross claimant, be, and the same is hereby, denied.

ORDERED FURTHER, that judgment be entered on behalf of the third-party defendant and cross claimant, Roy W. Sweeney, for loss of consortium claim in the amount of $125,000.00.

ORDERED FURTHER, that interest on the above judgments shall be computed from May 8, 1977 through July 4, 1979, at the rate of six (6%) per cent, and from July 5, 1979 to the date of this order, at the rate of eight and three-quarter (8¾%) per cent.[1]

AND IT IS SO ORDERED.

---

1. The allowance *vel non* of prejudgment interest in admiralty actions is a matter within the sound discretion of the trial court. *Gardner v. National Bulk Carriers, Inc.,* 221 F.Supp. 243, aff'd, 333 F.2d 676 (4th Cir. 1964); *Reiss S.S. Co. v. United States Steel Corp.,* 427 F.2d 1152, 1153 (6th Cir. 1970); *Rosa v. Insurance Co. of State of Pa.,* 421 F.2d 390, 393 (9th Cir. 1970).